H. W. GROUT, Appellant, v. N. E. KENDALL, Governor, et al., Appellees.

**CONSTITUTIONAL LAW:** Construction—Debt-Creating Power of
1 **State.** The constitutional declaration (Art. 7, Sec. 1) that "the *credit* of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation" simply means that the state shall not, under any circumstances, become *surety*. Said prohibition has no reference whatever to the power of the state to create its own *primary* indebtedness.

**CONSTITUTIONAL LAW:** Construction—Soldiers' Bonus Act. The ·
2 Soldiers' Bonus Act (Ch. 332, 39 G. A.), as enacted and as finally approved by the vote of the people, is held to comply with every requirement of Sec. 5, Art. 7, of the Constitution.

**CONSTITUTIONAL LAW:** Construction—Appropriation for Private
3 **Claim.** The various prohibitions of Sec. 31, Art. 3, of the Constitution of Iowa are all modified and made permissible by the last clause thereof, to wit, "unless such appropriation, compensation, or claim be allowed by two thirds of the members elected to each branch of the general assembly."

**CONSTITUTIONAL LAW:** Construction—Loaning Credit of State.
4 The authorization, issuance, and sale of bonds by the state, in order to raise funds with which to pay a bonus to the soldiers of the World War, do not constitute a loan of "the credit of the state" to said soldiers.

**CONSTITUTIONAL LAW:** Construction—Recognition of Moral Obli-
5 gation. The general assembly has a constitutional power to convert a *moral* obligation into a *public* obligation, and to provide the public funds to discharge the same. Ordinarily, the determination of the assembly is conclusive on the courts.

**UNITED STATES:** Declaration of War—Effect. When the United
6 States is at war, each and every state thereof is at war.

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

MARCH 13, 1923.

SUIT in equity by a taxpayer, to enjoin the governor of Iowa and other state officers named as defendants, from undertaking certain proceedings proposed by them, pursuant to Chapter 332 of the Laws of the Thirty-ninth General Assembly, known in the record as the Soldiers' Bonus Act, whereby such defendant officers proposed to issue and sell the bonds of the state of Iowa for $22,000,000, and proposed to levy a tax, pursuant to such act, for the purpose of paying and retiring such bonds. A demurrer to the petition was sustained by the district court. The plaintiff has appealed.—*Affirmed.*

*Parrish, Cohen, Guthrie & Watters,* for appellant.

*B. J. Gibson,* Attorney-general, *Casper Schenk, F. S. Holsteen, R. P. Howell, Arthur A. Zimmerman, L. L. Forbes, Harold R. Trewin, Max O'Brien, Claude M. Stanley, Leonard L. Ryan, R. F. Mitchell, David W. Stewart, James F. Barton, Vincent Starzinger, Ray McConlogue, Phineas M. Henry,* and *Vernon Seeburger,* for appellees.

EVANS, J.—The ground of plaintiff's prayer for relief is predicated upon the alleged unconstitutionality of the act in question. The act is too lengthy to be incorporated herein. Sufficient to say that it consists of fourteen sections, and was passed in due form by the legislature, and was duly approved by the executive on March 23, 1921, and duly ratified by vote of the electors, as provided by Section 13 thereof, at the general election held November 7, 1922. It provided an additional compensation of 50 cents per day of active service for every person who, being a resident of the state of Iowa, served in the military or naval service of the United States at any time between April 6, 1917, and November 11, 1918, subject to a maximum limitation upon such additional compensation of $350; it provided for the issue and sale of $22,000,000 of bonds for the purpose of

1. CONSTITUTIONAL LAW: construction: debt-creating power of state.

obtaining the funds with which to make the proposed payment; it provided the administrative method of distributing such funds to the appropriate beneficiaries; it provided for the levy of an additional direct annual tax upon all the taxable property of the state, at a rate sufficient to pay the annual interest and to pay and wholly retire the bonds progressively within a period of 20 years. The defendant officers were proceeding to carry out the duties laid upon them by this act, when this suit was instituted and temporary injunction was issued therein. The grounds upon which the constitutionality of the act is assailed may be briefly stated as follows:

1. That it is in violation of Section 1 of Article 7 of the Constitution.

2. That it is in violation of Section 2 of Article 7.

3. That it is in violation of Section 3 of Article 7.

4. That it is in violation of Section 4 of Article 7.

5. That it is in violation of Section 5 of Article 7.

6. That it is in violation of Section 6 of Article 1.

7. That it is in violation of Section 24 of Article 3.

8. That it is in violation of Section 29 of Article 3.

9. That it is in violation of Section 31 of Article 3.

10. That it is in contravention of the Fourteenth Amendment to the Constitution of the United States.

The emphasis of appellant's argument is put upon the first five sections of Article 7 of the Constitution, and especially upon Sections 1 and 5. To these sections we shall, therefore, devote the principal part of our discussion herein. For convenience of reference, we here set forth such sections:

"Article 7.—State Debts.

"Section 1. The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; and the state shall never assume, or become responsible for the debts or liabilities of any individual, association, or corporation, unless incurred in time of war for the benefit of the state.

"Sec. 2. The state may contract debts to supply casual deficits or failures in revenues; or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or

more acts of the general assembly, or at different periods of time, shall never exceed the sum of two hundred and fifty thousand dollars; and the money arising from the creation of such debts shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever.

"Sec. 3. All losses to the permanent school, or university fund of this state, which shall have been occasioned by the defalcation, mismanagement, or fraud of the agents or officers controlling and managing the same, shall be audited by the proper authorities of the state. The amount so audited shall be a permanent funded debt against the state, in favor of the respective fund sustaining the loss, upon which not less than six per cent annual interest shall be paid. The amount of liability so created shall not be counted as a part of the indebtedness authorized by the second section of this article.

"Sec. 4. In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or defend the state in war; but the money arising from the debts so contracted shall be applied to the purpose for which it was raised, or to repay such debts, and to no other purpose whatever.

"Sec. 5. Except the debts hereinbefore specified in this article, no debt shall be hereafter contracted by, or on behalf of this state, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; and such law shall be published in at least one newspaper in each county, if one is published therein, throughout the state, for three months preceding the election at which it is submitted to the people."

By way of preliminary observation, let it be noted that Section 1 is an unqualified *prohibition*. Whatever is prohibited thereby is prohibited without benefit of clergy. But Sections 2, 3, 4, and 5 are each a qualified *permission* to contract debt. Under Section 2, the purposes for which the debt may be contracted are general and undefined, but the power to contract is qualified by a maximum of $250,000. Under Section 3, there is no maximum in *amount;* but the *object* for which an unlimited indebtedness may be created is limited and specific. The same may be said of Section 4. Under Section 5, a wide door and an open sky are offered, provided that the indebtedness created thereunder shall be approved by a referendum to the electorate. No maximum is fixed. With these general observations, we may proceed to a consideration of the specific assignments of error:

I.   Does the act in question violate Section 1 of Article 7? We quote it again:

"Sec. 1.   The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; and the state shall never assume, or become responsible for the debts or liabilities of any individual, association, or corporation, unless incurred in time of war for the benefit of the state."

The construction which appellant puts upon this section is that it prohibits the creation of any indebtedness by the state, regardless of its public purpose or moral obligation, if it operates "in aid of any individual, association, or corporation." The argument is that by the issue of bonds the state will create an indebtedness, and that the purpose of such indebtedness is to aid the particular individuals who rendered service in the late war. It is important, therefore, that we discover and define clearly the field which is covered by this section and by the prohibitions thereof. The section does not, in terms, purport to deal with the creation of primary indebtedness by the state for any purpose whatsoever. The prohibition is that the state shall not lend its *credit* to any other being whatever, and that it shall "never assume" the debts or liabilities of any other being whatsoever. Omitting now all reference to the closing proviso, is there a distinction to be observed between a loan of credit and the power of the constituted authorities of the state to create a

primary indebtedness to subserve some public purpose or in response to some moral obligation? This section is not qualified in terms by any subsequent section. When we define its field, its prohibition is supreme therein and irrevocable. No public purpose can be meritorious enough, and no obligation of equity appealing enough, to override it.

What is meant herein by a loan of *credit?* When one signs an accommodation note and delivers it to his neighbor, he loans his credit to his neighbor. He has not created a debt to him. The neighbor is authorized to use the credit with third parties; but he is also under obligation to the maker to protect him against liability and ultimately to return the note. When one becomes surety for his neighbor and signs his promissory notes to third parties, he loans his credit. As to the holder of the note, he has promised to pay it; but as between him and the principal maker, it is still the debt of the principal, and not that of the surety. The liability of the surety is always secondary, and not primary. It is a liability for the debt of another, which such other is bound to pay. And herein is the delusion of suretyship. The surety assumes a secondary liability in the optimistic assurance and belief always that the primary debtor will pay, and that he will never be required to perform the obligation. A thrifty man who meets his own budget and refrains from incurring indebtedness with scrupulous care is often lured into large undertakings of suretyship which he would not undertake as a primary indebtedness, simply because he relies upon the primary debtor to pay. So for thousands of years gratuitous suretyship has been the bottomless pitfall of delusion into which men otherwise thrifty and frugal have persistently fallen. Solomon proclaimed him as "void of understanding" who becomes surety for his neighbor. Proverbs 17:18.

What has been true in the experience of the individual man has been true of sovereign states, and has been especially true of new states, confronted with the perplexities of unorganized conditions and with the temptation of visionary enterprise. This particular section of our Constitution was taken bodily from the Constitution of New York. As a part of the Constitution of New York, it was the result of past experience in the history, not only of New York, but of other states as well,

whereby aspiring new states had loaned their credit freely and
extravagantly to corporate enterprises which had in them much
seductive promise of public good.   These enterprises included
railways, canals, water powers, etc.   The corporate body in each
case was the primary debtor; the state became the underwriter;
it loaned its credit always with the assurance and belief that
the primary debtor would pay.   Pursuant to these secondary
liabilities, the state became overwhelmed with millions of dollars
of indebtedness which never would have been undertaken as a
primary indebtedness, and which never would have been per-
mitted by public sentiment if it had been known or believed
that the secondary liability would become a primary one through
the universal failure of the primary debtor.   The ultimate cry
of the surety is:   "I would not have become surety if I had
known or believed that I should have to pay the debt."   This
is as true of states as of individuals.   It was to remove this de-
lusion of suretyship, with its snare of temptation, that this sec-
tion of the Constitution was adopted.   It withheld from the con-
stituted authorities of the state *all power or function of surety-
ship*.   It forbade the incurring of obligations by the indirect
method of secondary liability.   This is the field and the full
scope of this section.   It does not purport to deal with the crea-
tion of a primary indebtedness for any purpose whatever.   That
question was left to be dealt with in other sections.   This con-
struction of Section 1 is consistent with such other sections.
The net effect of all the sections of Article 7 is that the only
liability for a debt which the state may incur is a primary lia-
bility.   It shall not be beguiled into indirect liability by the
promise and hope that a primary debtor will perform the obli-
gation.   If it incur liability, it must do so with the full realiza-
tion that the liability *must* be paid, and it must at the same time
provide the taxation by which payment *can* be made.   This
brings to bear immediately upon every proposed appropriation
or bond issue the restraints of the public mind and of the ines-
capable fact that what is *promised* by bond must be *performed*
by immediate taxation.   This power is constant, and operates
in restraint of extravagance and of ill advised undertakings.

We hold, therefore, that the prohibition of Section 1, Ar-
ticle 7, has no reference to the creation of a primary indebted-

ness. It necessarily follows that the power to create such an indebtedness and the limitations thereon must be sought in other sections of the Constitution.

II. What power is conferred by the Constitution to create indebtedness, and what are the limitations upon its exercise? We turn at once to the most comprehensive provision of the Constitution in that regard (which is also the section under which the legislature purported to proceed), Section 5 of Article 7:

2. CONSTITU-
TIONAL LAW:
construction:
Soldiers'
Bonus Act.

"Sec. 5. Except the debts hereinbefore specified in this article, no debt shall be hereafter contracted by, or on behalf of this state, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; and such law shall be published in at least one newspaper in each county, if one is published therein, throughout the state, for three months preceding the election at which it is submitted to the people."

The limitations and conditions which are imposed upon the debt-creating authority under this provision of the Constitution may be summarized briefly as follows:

(1)   Such debt must be authorized by some law.

(2)   It must be for some single object.

(3)   The object must be, distinctly specified in the law.

(4)   The law shall provide for the collection of a direct annual tax sufficient to pay the interest as it falls due, and to discharge the principal within twenty years.

(5)   Such law shall not take effect until ratified at a general election by a majority of all the votes cast.

(6)   Such law shall be duly published for three months preceding the general election at which it is submitted.

The act under consideration complies in its terms and specifications with all the conditions imposed by this section. The act as thus formulated and enacted by the legislature and approved by the executive was duly submitted at the general election in 1922, to the voting population, and was duly ratified by an undisputed majority of the votes cast.

When this much has been said, it leaves little room for debate. We see lacking no requisite material to the validity and efficacy of the act. We hold, therefore, that the act is not in violation of Section 5 of Article 7, but that it is strictly conformable therewith.

III.  Some emphasis is placed by appellant upon Section 31 of Article 3, which is as follows:

"No extra compensation shall be made to any officer, public agent, or contractor, after the service shall have been rendered, or the contract entered into; nor shall any money be paid on any claim, the subject-matter of which shall not have been provided for by pre-existing laws, and no public money or property shall be appropriated for local or private purposes, unless such appropriation, compensation, or claim be allowed by two thirds of the members elected to each branch of the general assembly."

3. CONSTITU-
TIONAL LAW:
construction:
appropriation
for private
claim.

It is urged that the act offends against this section. The argument in support of this point ignores the last clause of this section:

"Unless such *appropriation, compensation,* or *claim* be allowed by two thirds of the members elected to each branch of the general assembly."

It is contended that this section forbids that "any money be paid on any claim, the subject-matter of which shall not have been provided for by pre-existing laws," and it is assumed that this provision is not affected by the closing proviso of the section. This is a mere dissection of the Constitution. Section 31 is a complete proposition, and no part thereof is severable from the whole. Its closing proviso is made to apply in terms to the preceding reference to "appropriation," "compensation," and "claim." These words respond literally to the preceding terms of the section.

There is no allegation in the petition that the closing proviso was not observed and complied with; nor is there any such claim in argument. We must presume, therefore, in support of the legislation, that this proviso of Section 31 was complied with, and that Chapter 332 was adopted by a two-thirds vote of each branch of the general assembly. Indeed, we are advised by the briefs of appellees that such was the vote. We see no occasion, therefore, for an extended discussion of this point.

We deem that the consideration of the foregoing sections presents the crux of the controversy. The emphasis of appellant's argument is put upon them. Other sections, however, heretofore indicated, are specified, and their violation by this act is charged. A detailed discussion of each specified violation would extend this opinion to undue length, and we are disposed to refrain therefrom. Careful examination of each specification satisfies us that appellant's strongest points relate to the sections which we have here considered, and that none of the other specifications present questions of serious doubt. We hold that no one of them is well taken.

IV. We have not overlooked appellant's contention that the proposed issue of bonds by the state for the purpose of paying the "bonus" *is* a loan of credit; and that, therefore, it comes within the terms of Section 1, and is outside of the permission of Section 5. The argument is that the issue of a bond is an extension of credit. A bond is a credit. It is urged that, when the state borrows money upon its bonds for the purpose of paying the same to the beneficiaries of the act, it loans its credit to such beneficiary; because, without the credit of the state, the beneficiary could not obtain the money at all.

4. CONSTITUTIONAL LAW: construction: loaning credit of state.

The argument is not sound. The beneficiary is not a debtor at all. He sustains no relation of liability to the bondholder, either primary or secondary. The state recognizes the beneficiary as in the nature of a creditor, to whom the state proposes to pay its recognized obligation. The state becomes debtor to the bondholder under a primary liability, and not a secondary one. Neither legislator nor voter is beguiled by any delusion that the bonds will be paid by someone else as a primary debtor. In voting the appropriation, both legislator and voter frankly

face the constitutional necessity of an immediate tax levy, to meet the obligation thus assumed. This necessity is the practical safeguard of the Constitution, to compel legislator and voter to a thoughtful consideration of the expediency of the proposed appropriation. No more efficient safeguard could well be devised without unduly interfering with the exercise of the inherent power of the people of the state.

V.　There are a few general propositions which appellant presses upon our attention which may be briefly noticed. These are: That the legislation in question makes appropriation for the benefit only of individuals, and not for a public purpose; that the state is under no legal or moral obligation to make such appropriation; that, therefore, the appropriation is a mere gratuity. The argument at this point is based upon the analogies of private law. True it is that a promise of gratuity is not enforcible as between individuals, and that a mere moral obligation is not a valuable consideration. True it is, also, that the inherent power of taxation possessed by a sovereign state can be lawfully exercised only for a public purpose. The analogies of private law in respect to valuable consideration are not particularly helpful in defining the legislative power to appropriate moneys for specified purposes. The *legal* obligations of a state are few, as compared with the legislative appropriations which it makes. Legislative appropriations are not ordinarily made under legal compulsion. The great body of the obligations of a state are moral, rather than legal. Legislative appropriations are made voluntarily, either in response to moral obligation or to public expediency. In either event, they may be made for a public purpose. They are gratuitous in the sense that they are not compulsory. Whether a particular purpose is a public purpose and whether it has the sanction of a moral obligation of the state are questions which have never been definitely answered or defined. It has been quite uniformly held by the courts that the determination of such questions inheres largely in the legislative power. Within the zone of doubt, that *is* a moral obligation of the state and that *is* a public purpose which the legislature deems to be such. A few excerpts from the pronouncements of the United States Supreme Court

*(5. CONSTITUTIONAL LAW: construction: recognition of moral obligation.)*

may be deemed a sufficient discussion of this subject. From *Loan Association v. Topeka,* 20 Wall. (U. S.) 655, we quote:

"In deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

From *United States v. Realty Co.,* 163 U. S. 427, 443:

"The nation, speaking broadly, owes a 'debt' to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. To no other branch of the government than Congress could any application be successfully made on the part of the owners of such claims or debts for the payment thereof. Their recognition depends solely upon Congress, and whether it will recognize claims thus founded must be left to the discretion of that body. Payments to individuals, not of right or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government by virtue of acts of Congress appropriating the public money, ever since its foundation. * * * The power to provide for claims upon the state founded in equity and justice has also been recognized as existing in the state governments. For example, in *Guilford v. Chenango County,* 13 N. Y. 143, it was held by the New York Court of Appeals that the legislature was not confined in its appropriation of public moneys to sums to be raised by taxation in favor of individuals to cases

in which legal demands existed against the state, but that it could recognize claims founded in equity and justice in the largest sense of these terms or in gratitude or in charity.  Of course, the difference between the powers of the state legislatures and that of the Congress of the United States is not lost sight of, but it is believed that, in relation to the power to recognize and to pay obligations resting only upon moral considerations or upon the general principles of right and justice, the Federal Congress stands upon a level with the state legislature. * * * In regard to the question whether the facts existing in any given case bring it within the description of that class of claims which Congress can and ought to recognize as founded upon equitable and moral considerations and grounded upon principles of right and justice, we think that generally such question must in its nature be one for Congress to decide for itself.  Its decision recognizing such a claim and appropriating money for its payment can rarely, if ever, be the subject of review by the judicial branch of the government.  Upon the general principle, therefore, that the government of the United States, through Congress, has the right to pay the debts of the United States, and that the claims in these cases are of a nature which that body might rightfully decide to constitute a debt payable by the United States upon considerations of justice and honor, we think the act of Congress making appropriations for the payment of such claims was valid without reference to the question of the validity or invalidity of the original act providing for the payment of bounties to manufacturers of sugar, as contained in the tariff act of 1890.'' .

The foregoing excerpts reflect the quite universal pronouncements from the state courts upon the same subject.

Looking at the legislative history of Iowa in the light of the foregoing, we find it besprinkled with soldier legislation: Soldier bounty; soldier exemption; soldier preference; soldiers' home and soldier memorial.

To hold now judicially that the act in question serves no public purpose and responds to no moral obligation would not only be to belie our legislative history, but would be a judicial interference with the prerogative of the legislature, and contrary to the weight of judicial precedent.

VI. We are not unmindful of the recent judicial precedents which are brought to our attention. The act under consideration is similar in its character to the legislation of many other states, the validity of which has been quite uniformly assailed. A large majority of the courts of last resort which have passed upon these enactments have sustained them as valid. We are not disposed to rest our decision upon these precedents, mainly for the reason that the Constitutions of the respective states are not identical in their terms. To follow a precedent as such would impose upon us the duty of comparison and differentiation of the respective Constitutions. This would present added difficulty. Though it be true that our own Section 1 of Article 7 was taken bodily from the Constitution of the state of New York, yet, since the time of such adoption by us, the Constitution of the state of New York was amended so as to extend the prohibition originally contained in such section, and to forbid not only the loaning of credit but also the "giving of money." (Section 9, Article 8.) This important amendment to the Constitution of New York was influential upon the result of the test case in that state wherein the Court of Appeals held adversely to the validity of the Bonus Act of that state. Likewise in California, the decision adverse to the validity of the legislation was largely based upon constitutional provisions which have no equivalent in the Constitution of Iowa, either in terms or in substance. The same is true of Montana, whose Constitution at this point is the equivalent of that of New York. The decision there was adverse to the legislation, and in harmony with the New York holding. It is to be conceded that the judicial opinions filed in those states make some pronouncements by way of argument, which tend to sustain the position of appellant herein. These are reducible to two broad propositions:

(1) That only the United States was at war with Germany; that the states were not at war; that they incurred no war obligation, either legal or moral.

(2) That the appropriation of money for the use of the soldiers was a private donation, because the state was under no legal obligation to pay; that the legislature had no power to vote an appropriation to any class of individuals unless it was

6. UNITED STATES: declaration of war: effect.

already under legal obligation to do so; that not even an assumed moral obligation would save such appropriation from being a donation to individuals.

These propositions, if accepted, would reach the Iowa legislation herein under attack, even though they were not essential to the determination of the cases wherein they were made. Because of the high respectability of their source, we have given them very thoughtful consideration. We are unable to assent to either of them as being sound in principle or sustained by weight of authority. The first proposition is predicated upon the fact that only the United States, and not the states, has power to declare war. From these premises it would follow that a state could never be at war. The Constitution of Iowa implies to the contrary, and several of its saving provisos apply to a "time of war." Even Section 1, Article 7, lifts its prohibition "in time of war for the benefit of the state." Section 4 of the same article provides expressly that "the state may contract debts to * * * defend the state in war." Similar provisions are contained in many of the Constitutions of the states, and doubtless in all of them. If the state can never be at war because it has delegated away its power to declare war, then these provisions of the Constitution reflect gravely upon the intelligence of the framers thereof.

The United States was the conception and the creation of the states. Its sovereignty was the joint sovereignty of all the states, and was conferred by the states as a delegated power. The states became and have ever remained the component parts of the United States. It has its concrete entity in and through them. They are its body. It can have no other. The membership of the legislative department of the United States is apportioned to and elected by the states. It is a part of their function. Congress is the agency clothed with the power "to declare war." The power to declare war was surrendered by the states and delegated to Congress. Did such delegation terminate all interest of the states in future war; or did it rather create mutual rights and obligations, as between the United States and its component states, in the exercise and in the event of exercise of such delegated power? Can the United States be at war and the states be at peace? Can the United States

go to war and claim absence and exemption for its component parts? If there shall ever be a "time of war" in Iowa, it must be upon the declaration of the United States. Iowa cannot declare war. Can the United States declare war for Iowa and peace for Montana? Can there be a war against any state that is not a war against the United States, or vice versa? Is it not necessarily true that there can be no war against any state that is not a war against all the states? Is the menace to the state any less because the declaration of war was not of its doing? As this question presents itself to our minds, we can see but one rational practical conclusion. When the United States declared war with Germany, it put at war every fiber of its power and every foot of its domain. It became thereby entitled, not only to the patriotic activities of all its individual citizens, but also to the organized power and to the loyal co-operation of all its component states. Any lesser conception than this of the entity of the United States would reduce it to a shadow, without real substance, and without sufficient specific gravity to hold it to its foundation.

As to the second proposition, that there is no legislative power to appropriate money to an individual or class except in discharge of a legal obligation, as distinguished from a moral obligation, we deal again with an abstract proposition that is not easy to define. In the judicial pronouncements under consideration, no attempt is made to define a legal obligation as between a state and an individual. But if anything is to be built upon such pronouncement, a definition must be made, sooner or later. It ought to be found before the building is begun. Antecedent to any legislative enactment thereon, what is a legal obligation of the state to an individual or class? How is such an obligation created? Suppose we say that the bonds of a state are strictly legal obligations. But such obligation is not *antecedent* to legislative enactment thereon. Valid bonds are issued only pursuant to legislative enactment, and they become legal obligations *because* of legislative enactment. It must be deemed notoriously true that the great body of legislative appropriations are made for uses which constitute no legal obligation on the part of the state, as distinguished from a moral one. When a legislative appropriation is enacted, a legal obligation may

and usually does arise. The pronouncement under consideration is that the legislature has no constitutional power to make such an appropriation to the use of any individual or class, except in response to a legal obligation already existing antecedent to the legislation. Now, if there can be, in such cases, no legal obligation without legislative enactment, and no legislative enactment without pre-existing legal obligation, our reasoning is lost in the vicious circle. What becomes of the power of the legislature in the field of appropriation which it has occupied unchallenged for scores of years? Is it not, the rather, true that the legal obligation of the state, as distinguished from a moral one, is a rare and infrequent specimen, and that the state as a sovereign body recognizes claims which rest upon such principles of right and equity as are fundamental to our jurisprudence, and which appeal to the public sense of justice as a moral obligation on the part of the state? Though the legislature has no right to appropriate money as a mere charity or gratuity, yet it does have a right to recognize the essential justice of a claim against the state, as weighed or measured by the standards here indicated. The facts appearing in *Metz v. Soule, K. & Co.,* 40 Iowa 236, are indirectly in point as an illustration. It appeared therein that a convict in the penitentiary was injured while engaged in work under the direction of the agencies of the state, and that his injury resulted through obedience to those in charge of him. He petitioned the legislature for redress. The state was not under legal obligation to pay. The claim rested, however, upon the principle of fundamental justice. The legislature recognized the moral obligation of the state, and by legislative appropriation created a legal obligation on the part of the state to pay to the petitioner monthly payments of $12.50 per month during his life. It is undoubtedly true that the legislature has no power to grant private charities or gratuities, and that it is bound to confine its appropriations to the field of public purpose, and that it cannot recognize claims for compensation which are not founded in good faith upon the principles here indicated; yet it is also true that the line of demarcation between an allowable claim and a nonallowable one is not always clear or definite, and that there is necessarily a zone of doubt on either side of the line where the judgment

of the membership of the legislature, under the sanction of their official oaths, becomes the only practicable criterion of the validity of the claim as a moral obligation on the part of the state. We deem it necessarily true, therefore, that the pre-existing legal liability of the state is not the criterion; and that the question of public purpose and of moral obligation, as presented in the case at bar, is within the legislative zone of doubt.

We do not assume to disagree with the courts of the three states above named in their construction of the language of their respective Constitutions, nor do we assume to say that the pronouncements made in the respective opinions are not germane to and justified by the particular constitutional language under construction. But in so far as the propositions above discussed are detached from their context and presented to us in argument as sufficiently comprehensive to control the construction of the language of the Iowa Constitution, we cannot accept them to that end. Nor can we agree that these pronouncements so detached from their context are correct, as abstract propositions of law.

In all of the other states where the question has been put. to judicial test, the validity of the legislation has been sustained.

It is our conclusion that the demurrer to the petition was properly sustained. The judgment below is—*Affirmed.*

PRESTON, C. J., WEAVER, STEVENS, ARTHUR, FAVILLE, and DE GRAFF, JJ., concur.