## MARYLAND INDUSTRIAL DEVELOPMENT FINANCING AUTHORITY, ET AL. *v.* HELFRICH

[No. 117-Adv., September Term, 1968.]

*Decided July 17, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-

BURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Anthony M. Carey, III* and *Thomas A. Garland, Assistant Attorneys General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellants.

*Charles J. Stinchcomb,* with whom were *John R. Royster, Richard J. Himelfarb* and *Weinberg & Green* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

The proliferation of the programs by which states, counties and municipalities in the United States have endeavored to attract industry is one of the more remarkable of the economic developments of the past three decades. The phenomenon has been the subject of a financial study by Lechner, *Industrial Aid Financing* (Goodbody & Co., 1965) and legal considerations have been reviewed by Heins, *Constitutional Restrictions Against State Debt* (Univ. of Wisconsin Press, 1963) and in *The Constitutionality of Industrial Development Acts,* 35 Univ. of Colo. L. Rev. 556 (1963).

While the schemes adopted by the several states are variously structured, and may be financed by the issuance of general obligation bonds, by the sale of revenue bonds, by guarantees of debt, or in some other fashion, they all share the common purpose of attempting to attract new industries to underdeveloped areas in the hope of providing employment, increasing consumer buying power and ultimately of making substantial additions to the tax assessment rolls. These ends are usually accomplished by the construction of plants or the acquisition of facilities by either the state, a county or a municipality or by a non-profit development corporation. The plant or facility is then leased to an industrial concern at an annual rent sufficient to cover interest charges and amortization of all or substantially all of the principal amount of the debt during the initial term of the lease. The lease usually accords the lessee the option of purchasing the plant or the facilities for a nominal consideration at the end

of the term of the lease, or at an earlier date, if the principal amount of the debt is prepaid and interest has been paid to the date of prepayment. In some instances, the plant is not subject to the payment of property taxes or of full property taxes while owned by the state, county or municipality; in others, an annual payment in lieu of taxes is added to or incorporated in the rent reserved.

State-sponsored industrial development took its first faltering step in Mississippi in 1936 under that state's BAWI plan (Balance Agriculture With Industry) [1] when an $85,000 general obligation bond issue was sold to finance the construction of a factory in the town of Durant for Realsilk Hosiery Mills.[2] The Mississippi idea took hold slowly, being followed by Kentucky in 1948; by other states, including Alabama and Tennessee, in 1951; and by still others, including Arkansas by 1958.[3] By 1965, more than 30 American states had adopted some form of industrial development financing,[4] and statistics assembled by the Investment Bankers Association (the I.B.A.),

---

1. Constitutionality upheld in Albritton *v.* City of Winona, 181 Miss. 75, 178 So. 799, 115 A.L.R. 1436, appeal dismissed, 303 U.S. 627 (1938).

2. Lechner, *op. cit.,* at 2.

3. Lechner, Table 1, at 3.

4. Lechner, at 3; 35 Univ. of Colo. L. Rev. 556 (1963). *E.g.,* Ala. Code Ann., tit. 37, § 511 (20)—(32) (1951); Ark. Const. Amend. No. 49; Ark. Stat. Ann., §§ 9-501 to 9-566 (1955); Conn. Gen. Stat. Ann., tit. 32, § 10 ff; Del. Code Ann., tit. 6, §§ 7001-7009 (1961); Hawaii Rev. Laws, ch. 28B (1955); Ill. Ann. Stat., ch. 24, §§ 11-74-1 to 11-74-13 (1961); Ind. Stat. Ann., tit. 25, §§ 4701-4711 (1961); Kan. Stat. Ann., ch. 12, §§ 1740-1749 (1961); Ky. Rev. Stat. Ann., §§ 103.200-103.285 (1946); Me. Rev. Stat. Ann., tit. 10, §§ 701-852 (1957); Mass. Ann. Laws, C. 40D, §§ 1-20 (1967); Mo. Const., art. VI, §§ 23(a), 27 (1960); Neb. Const., art. XV, § 16; Neb. Rev. Stat., ch. 18, §§ 1614-1623 (1961); N.H. Rev. Stat. Ann., ch. 162-A:1 to 162-A:16 (1955); N. J. Stat. Ann., 40:190 (1936); N. Y. Const., art. 7, § 8 (1966); N. D. Cent. Code Ann., §§ 40-57-01 to 40-57-20 (1955); Okla. Stat. Ann., tit. 62, §§ 651-664 (1961); Penna. Stat. Ann., tit. 73, §§ 301-314 (1956); R. I. Gen. Laws, §§ 42-34-1 to 42-34-18 (1958); Tenn. Code Ann., §§ 6-2901 to 6-2916 (1955); Vt. Stat. Ann., tit. 10, ch. 11, §§ 201 ff. (1961); W. Va. Code, §§ 31-15-1 to 31-15-15 (1961).

which do not purport to be complete, show that the annual volume of industrial development bond issues, which averaged a mere trickle of $8,000,000 during the years 1951-57, had, by 1965, become a mighty torrent of $200,000,000 per year.[5] At that time, of the some $700,000,000 of industrial development bonds known to be outstanding by the I.B.A., more than $500,-000,000 had been generated by the programs sponsored by Mississippi, Alabama, Tennessee, Arkansas and Kentucky.[6] General obligation bonds, in which the faith and credit of the state or municipality had been pledged to the payment of the principal of and interest on the debt incurred, accounted for some 20% of the $700,000,000 known to be outstanding; the balance consisted of revenue bonds, where the income from the project was pledged to debt service, or of other forms of contingent or indirect obligations.[7] By the end of 1966, 35 states had authorized industrial development bonds, and in that year there were over $500,000,000 in new public issues. In 1967, this grew to 40 states with over $1 billion in new issues. Privately placed issues may amount to more than twice these amounts.[8]

In 1965, when the Maryland Legislature first entered the field of industrial development financing on a state level, the issuance of revenue bonds for industrial development purposes had come under attack in the financial community [9] and the exemption of the interest on the bonds from federal income tax was being restricted by the Internal Revenue Service.[10] Whether for this, or for some other reason, the General Assembly chose to plot a more conservative course.

By Chapter 714 of the Laws of Maryland of 1965, later

---

5. Lechner, Table 2, at 6.

6. Lechner, Table 3, at 9.

7. Lechner, Table 4, at 10.

8. Memorandum accompanying letter, 23 January 1968 from Stanley S. Surrey, Asst. Sect'y of the Treasury, to Representative Wilbur D. Mills, Chairman of House Ways and Means Committee. CCH Standard Fed. Tax Reporter (1968) at 71,136-37.

9. Lechner, at 36-39.

10. Rev. Rul. 63-20, Cum. Bull. 1963-1, at 24. The exemption has since been further limited by Revenue Act of 1968, Tit. I, § 107.

amended by Chapter 222 of the Laws of 1966 and Chapter 642 of the Laws of 1967, (Maryland Code 1957, 1965 Replacement Volume and 1967 Supp.) art. 41, §§ 266 J to 266 CC (the Act) the General Assembly created the Maryland Industrial Development Financing Authority (the Authority), consisting of five members appointed by the Governor, a "body corporate and politic" and a public instrumentality of the State. The Authority is charged with the responsibility of filling the need which exists "for new and expanded industrial enterprises to provide enlarged opportunities for gainful employment by the people of Maryland and thus to ensure the preservation and betterment of the economy * * * in the interest of the public welfare."

The Authority has been previously characterized by us as "one of three statutory stimuli to industrial development," *Md. Indus. Devel. v. Meadow-Croft,* 243 Md. 515, 221 A. 2d 632 (1966), another being found in Maryland Code (1957, 1965 Replacement Volume, 1967 Supp.) art. 41, §§ 266 A to 266 I, which permits the issuance of revenue bonds (a pledge of the full faith and credit of the county or municipality is prohibited by § 266 D) by county and municipal governments for the construction of industrial buildings and port facilities to be leased to private tenants, *Frostburg v. Jenkins,* 215 Md. 9, 136 A. 2d 852 (1957). For other cases involving the issuance of revenue bonds by instrumentalities see *Lerch v. Md. Port Authority,* 240 Md. 438, 214 A. 2d 761 (1965) (international trade center); *Castle Farms Dairy Stores, Inc. v. Lexington Mkt. Authority,* 193 Md. 472, 67 A. 2d 490 (1949) (public market) and *Wyatt v. State Roads Comm'n.,* 175 Md. 258, 1 A. 2d 619 (1938) (toll bridge). The third stimulus referred to in *Meadow-Croft* is found in Code (1957, 1966 Replacement Volume) art. 23, §§ 412-429, creating Development Credit Corporation, which makes direct loans to industries. *Development Credit v. McKean,* 248 Md. 572, 237 A. 2d 742 (1968).

The Act is patterned after a similar plan adopted by Rhode Island in 1958, R. I. Gen. Laws (1956 Edition and 1967 Supp.) 42.34.1 to 42.34.18, *Meadow-Croft, supra,* 243 Md. at 524, and our comparison of the Rhode Island act with the law

which set up Maine's Industrial Building Authority in 1957 shows them to be virtually identical.[11]

The Maine, Rhode Island and Maryland plans contemplate that the impetus to the financing of industrial development will come from the Authority's guarantee of mortgage loans and that the loan funds themselves will be provided by banks and insurance companies. This was selected as an alternative to revenue bonds, on the one hand, which are seldom issued in the field of industrial financing in amounts large enough to be advantageously marketed; and to general obligation bonds, on the other, which have a direct impact on the credit of the state.

The Maryland Act requires that the mortgagor must be a county or municipality of the State, or a development corporation organized under the law of and operating within Maryland; that such mortgages, if secured by real property, must be for a term not longer than 25 years, and if secured by machinery and equipment, must have a maturity not greater than 15 years, and in no event shall be for a term longer than the period for which such property, machinery or equipment is leased. All such mortgages must be first liens; must not exceed 90% of the cost of the project (70% in the case of machinery and equipment), nor the amount of $4,000,000 for any one project, nor an aggregate of $30,000,000 for all such projects. The mortgagor, if a county or municipality, is prohibited by § 266 W of the Act from pledging its full faith and credit for the repayment of the mortgage debt. It is anticipated that the rent reserved under the lease of the mortgaged property must, during the initial term, be in an amount sufficient to provide for the payment of interest and the complete amortization of the mortgage debt. § 266 U requires that the lease also provide for the payment of an insurance premium by the borrower to the Authority, in an amount not to exceed three percent of the principal obligation, which shall be deposited in a revolving

11. Lechner, at 26, says that the Maine and Rhode Island plan was subsequently adopted by Connecticut, New Hampshire, Vermont, Pennsylvania and Delaware and that as of 1965 "The seven states have an authorized lending capacity of $100 million." Later in this opinion, there is a recital of the reasons why this statement should be qualified.

fund from which the Authority shall pay its expenses and meet any obligation which it may incur in the operation of its insurance program. In addition, the Legislature makes an annual appropriation of $100,000 to the fund.

As originally enacted, the Act contained two sections, which were before us in *Md. Indus. Devel. v. Meadow-Croft,* 243 Md. 515, 221 A. 2d 632 (1966).

> § 266 L initially provided:
> "The Maryland Industrial Financing Authority is authorized to insure the payment of mortgage loans secured by industrial projects, and to this end the faith and credit of the State are hereby pledged, *consistent with the terms and limitations of the terms of this subtitle.*" (Emphasis supplied)
>
> As originally adopted, § 266 Z read:
> "If from time to time in the opinion of the Authority the addition of moneys to the mortgage insurance fund is required to meet obligations, the Authority in writing shall request the Governor to provide sufficient moneys for this purpose. The Governor *may* submit this request to the next regular session of the General Assembly, as an item of appropriation in the budget bill." (Emphasis supplied)

In *Meadow-Croft, supra,* we found § 266 L invalid because, if the language "consistent with the terms and limitations of the terms of this subtitle" were read in conjunction with § 266 Z, which provided, "[t]he Governor *may* submit this request to the next regular session of the General Assembly" (emphasis supplied), the obvious conclusion was that the pledge of credit contained in § 266 L, as the lower court characterized it, was "meaningless, and indeed misleading." 243 Md. at 521.

In an effort to meet the thrust of *Meadow-Croft,* the General Assembly, by adopting Chapter 642 of the Laws of 1967, amended both § 266 L and § 266 Z. As amended, § 266 L now reads:

> "Section 266 L. Credit of state pledged.
> The Maryland Industrial Development Financing

Authority is authorized to insure the payment of mortgage loans secured by industrial projects, and to this end *the faith and credit of the State are hereby pledged to the extent of thirty million dollars ($30,000,000)."* (Emphasis supplied)

It will be noted that the italicized phrase was substituted for the phrase "* * * the faith and credit of the State are hereby pledged, consistent with the terms and limitations of the terms of this subtitle," which appeared in the 1965 Act.

It will be recalled that § 266 Z of the 1965 Act contained the permissive language, "[t]he Governor *may* submit this request to the next regular session of the General Assembly * * *" (emphasis supplied), which we found objectionable in *Meadow-Croft*. In its stead, the 1967 amendment substituted the following:

> "Section 266 Z. Additions to Mortgage Insurance Fund; State Industrial Development Loan Fund.
>
> (a) *Request to Board of Public Works.* If from time to time in the opinion of the Authority the addition of moneys to the mortgage insurance fund shall be required, the Authority in writing shall request the Board of Public Works to provide sufficient moneys to maintain its reserve at a level deemed adequate by the Authority, and upon receipt of such request, said Board may pay over the amount so requested from its emergency fund.
>
> (b) *Issuance of State loan; maximum amount.* In the event the Board of Public Works does not have sufficient funds available to meet the request or elects not to make payment from the emergency fund, the Board shall issue a State loan in the amount sufficient to meet all obligations undertaken by the Authority in the insurance of mortgages pursuant to this subtitle, such State loan to be known as the 'State Industrial Development Loan Fund' not to exceed in the aggregate the sum of thirty million dollars ($30,000,000)."

These amendments had the effect of bringing the Maryland Act into conformity with those previously adopted in Maine and Rhode Island, by making the supplementation of the mortgage insurance fund mandatory.

This, then, was the way matters stood on 27 May 1968. On that day, the Authority wrote to the secretary of the State's Board of Public Works, advising him that the Authority had already insured mortgages in the aggregate principal amount of some $555,000; had committed itself to insure additional mortgages amounting to $3,558,890; and had under consideration other projects which would involve insuring an additional $7,000,000 of debt. The letter pointed out that counsel for two banks which had been approached for mortgage loans had questioned the validity of the purported pledge of the State's credit; that without being able to make the representation that agreements insuring such mortgages were, in fact, backed by a pledge of the State's credit, there would be a deterioration in the ability of counties and municipalities to negotiate mortgage loans on an advantageous basis; and that the banks had indicated that it would be desirable for the Authority to expand its reserve funds, which as the result of annual appropriations by the Legislature and the receipt of insurance premiums then totalled some $400,000, to an amount equal to 20% of the mortgages then insured or to be insured, or $3,000,000 in reserve funds. This would involve the issuance and sale of bonds in the aggregate principal amount of $2,600,000, the proceeds of which when added to the reserve fund, would support the insuring of mortgages aggregating $15,000,000 in principal amount.

Helfrich, the appellee here and complainant below, instituted a taxpayer's action in equity in the Circuit Court of Baltimore City against the Authority and the Board of Public Works, the appellants here, seeking declaratory and injunctive relief; a declaration:

(1) holding the Act and the transactions proposed by the Authority to be unconstitutional and void;

(2) holding § 266 L of the Act to be unconstitutional and void;

(3) holding § 266 L of the Act to be invalid, void and of no effect because it erroneously declares that the faith and credit of the State would be pledged by the Act to the payment of the principal of and interest on mortgages insured under the Act;

(4) holding § 266 Z of the Act to be unconstitutional and void; and

(5) construing § 266 Z of the Act and determining the effect, if any, of its provisions,
and an injunction:

(1) forbidding appellants to represent in any way that the faith and credit of the State are pledged to the payment of the principal of and interest on mortgages insured under the Act;

(2) forbidding appellants to take any action pursuant to the purported authority of the Act;

(3) forbidding any payment from the State's Emergency Fund or the issuance of State bonds by the Board of Public Works, pursuant to the purported authority of the Act; and

(4) directing the Board of Public Works to order the Comptroller and the Treasurer to withdraw all moneys committed to the mortgage insurance fund under the purported authority of the Act.

The chancellor entered a decree declaring § 266 L of the Act an unconstitutional pledge of the State's credit in contravention of § 34 of art. III of the Maryland Constitution, and therefore of no force and effect; declaring subsections (b) through (i), inclusive, and the second sentence of subsection (k) of § 266 Z of the Act (which contained technical language providing for the issuance and sale of bonds) unconstitutional on the ground that the subsections implemented the unconstitutional pledge provided for by § 266 L; declaring that subsection (a) of § 266 Z of the Act validly authorized the Board of Public Works to pay money from the State's Emergency Fund to the mortgage insurance fund maintained by the Authority pursuant to § 266 S of the Act; and declaring all other provisions of the Act constitutional and valid.

The decree also enjoined the Authority from representing that the faith and credit of the State was pledged to the insurance of the payment of principal of and interest on mortgages created pursuant to §§ 266 J-266 CC of art. 41 of the Code,

and the Board of Public Works was enjoined from taking any action pursuant to the authority granted them by subsections (b) through (i) of § 266 Z of art. 41.

It is from this decree that the present appeal was taken. Helfrich entered a cross appeal from that portion of the decree which failed to grant him the other relief prayed.

Maryland Constitution, art. III, § 34 provides:

> "The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual association or corporation * * *."

The history of this prohibition, which first appeared in the Constitution of 1851, and was carried over, virtually unchanged, to the Constitutions of 1864 and 1867, has engaged the attention of this Court in *Development Credit v. McKean, supra; Maryland Ind. Dev. v. Meadow-Croft, supra; Lerch v. Maryland Port Authority, supra; Johns Hopkins Univ. v. Williams,* 199 Md. 382, 86 A. 2d 892 (1951) and need not be extensively recounted here. It is sufficient to point out that the constitutional limitation was adopted in Maryland, as in other states, as a reaction to the excesses of the early nineteenth century, when the reckless guarantee of the obligations of privately owned canals and railroads had brought the states, Maryland included, to the verge of bankruptcy.

But, says the Authority, in effect, reason is the life of the law,[12] and we should not permit twentieth century development to be fettered by strictures imposed a century or more ago, the reasons for which have long since disappeared. In support of this proposition, the Authority cites the opinion of this Court in *Johns Hopkins Univ. v. Williams, supra,* where Chief Judge Marbury, who filed the opinion for the Court, after discussing the constitutional prohibition against a loan of the State's credit, said:

> "The unquestionable historical reason for the proposal of the constitutional section, both in New York

---

**12.** Coke, *First Institute,* paraphrased in Coggs v. Bernard, 2 Ld. Raym. Rep. 911 (1703). Had the Authority actually said this, Helfrich might have countered with, "The life of the law has not been logic, it has been experience." Holmes, *The Common Law* (1881) at 1.

and in Maryland, was to curb the reckless and improvident investment of public funds in aid of railroads and canals, promoted by private corporations, organized primarily for profit to their stockholders, although they might eventually serve a public purpose. That was the evil that had impaired or threatened the credit of these and other states, and that was the evil primarily in the minds of the framers of our constitution of a hundred years ago. *Whatever they said in that instrument must be considered in the light of what they were trying to prevent in the future. Now, a century later, we must decide whether, by what they then said, they foreclosed something which was not and could not have been envisioned by them, and which had no relation whatever to the problems they were facing."* (Emphasis supplied) 199 Md. at 398-99.

This argument is not lacking in persuasiveness, particularly since the need for attracting industry to the State is beyond question. The executive secretary of the Somerset County Redevelopment Corporation, in his testimony below, pointed out that his county could incur no additional debt without jeopardizing the A rating now enjoyed by its presently outstanding bonds; that the mechanization of agriculture and the decline in the seafood industry, the county's two principal activities, had brought about an unemployment rate which averaged 15% ; and in reply to the question, "Why does Somerset County need this industry that is proposed?", said, "This is like asking a starving man why he needs food." Unhappily, necessity or desirability will not of themselves resolve a constitutional issue.

In *Hopkins,* we upheld the validity of an Act of the Legislature authorizing the issuance and sale of State bonds in an aggregate principal amount of $1,500,000 and the delivery of the proceeds of the loan to the trustees of The Johns Hopkins University for the use of its School of Engineering. The opinion drew a sharp distinction between a grant of funds and loan of credit, and concluded that the constitutional prohibition against a loan of the State's credit could not be invoked against a grant of funds to a private institution, so long as the appropriation of

funds was for a public purpose, even although the funds had been borrowed through the use of the State's credit.

In *Development Credit v. McKean, supra,* we had before us the validity of Maryland Code (1957, 1966 Replacement Volume) art. 23, § 426 which had been amended to provide:

> "The faith and credit of the State of Maryland, with the approval of the Board of Public Works, may be pledged to secure bonds, debentures, notes, or other evidences of indebtedness, issued on or after June 1, 1966, by Development Credit Corporation * * *."

We determined that Maryland had

> "adopted the rule that the prohibition against the loan or pledge of a state's credit is directed against the guaranty by a state of the debt of another and is not a limitation on the creation of an indebtedness for which a state is primarily liable" 248 Md. at 576-77, citing *Grout v. Kendall,* 195 Iowa 467, 192 N. W. 529 (1923) ; *Hagler v. Small,* 307 Ill. 460, 138 N. E. 849 (1923) ; *Bush v. Martineau,* 174 Ark. 214, 295 S. W. 9 (1927) ; *Gruen v. Tax Commission,* 35 Wash. 2d 1, 211 P. 2d 651 (1949).

To put the matter simply, is the question before us controlled by *Hopkins* or *Development Credit?* Obviously, the Authority is an instrumentality of the State. If the State had chosen to borrow the money required, had secured the borrowing by a pledge of its faith and credit, and had loaned or given the proceeds to the Authority, to be used for a public purpose, *Hopkins* would have insulated the transaction from successful assault. *Truitt v. Board of Public Works,* 243 Md. 375, 398-400, 221 A. 2d 370 (1966) ; *Melvin v. Anne Arundel County,* 199 Md. 402, 86 A. 2d 902 (1952).

This was not the path which the Act chose to follow. § 266 Z, as amended, now provides that if the Authority determines that additions to the mortgage insurance fund are required, a request for funds is to be made to the Board of Public Works. The Board may make the payment from State funds, but to the extent that sufficient funds are unavailable, shall provide the

funds through the sale of State bonds. As amended, § 266 Z cures the vice of the optional characteristic which gave rise to *Meadow-Croft,* by making the supplementation of the insurance fund mandatory. As we have already indicated, it brought the Maryland Act into conformity with those adopted in Maine and Rhode Island.

The result of the amendment is that the constitutional issue, which figured obliquely in *Meadow-Croft,* is now squarely before us: Is this a gift or loan of credit falling within the prohibition contained in Constitution, art. III, § 34:

> "The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual association or corporation; nor shall the General Assembly have the power in any mode to involve the State in the construction of works of internal improvement, nor in granting any aid thereto which shall involve the faith or credit of the State; * * *"

The Authority urges that no constitutional problem is involved, since what the State is guaranteeing is an obligation of a county or municipality [13] on a mortgage given to secure the repayment of money borrowed to build or acquire the industrial facility, and that the loan of credit to a county or municipality, a subdivision of the State, is not the loan of credit to "an individual association or corporation" prohibited by the constitution. The weakness of this argument lies in the fact that it overlooks the provision contained in § 266 W of the Act, which provides that:

> "A municipality or county, *without in any event pledging its full faith and credit in support of a mortgage,* may borrow money and execute a mortgage as security * * *." (Emphasis supplied)

Helfrich argues that the true mortgagor is not the county or municipality, which assumes no responsibility for the payment

---

**13.** During argument before us, the State conceded that no mortgage made by a development corporation had thus far been guaranteed by the Authority.

of the mortgage debt, but the lessee of the industrial facility, and that a loan of credit to the lessee is clearly within the scope of the constitutional prohibition. It seems to us that we need neither accept nor reject this contention, since the State's credit, if pledged to guarantee a mortgage, clearly has been "given * * * in aid of * * * [a] corporation * * *" and this is what the Constitution prohibits. The practical result of the provisions of the Act is to substitute the State's continuing guaranty of obligations which are indefinite in duration and uncertain in amount (except for ceiling of $30,000,000) for a present appropriation of funds. As we said in *Meadow-Croft,* 243 Md. at 523, we will not construe the faith and credit clause of the Constitution to mean less than it says, and it is our view that § 266 L's attempt to pledge the State's faith and credit to the guaranty of mortgages to a maximum amount of $30,000,000 is unconstitutional and void.

This conclusion is entirely consistent with the treatment accorded the Maine and Rhode Island Acts. The Maine and Rhode Island Acts, like Maryland's, anticipated that industrial facilities would be financed with funds obtained from private sources, but that loans would be guaranteed by the Authority. Both Maine and Rhode Island contemplate that properties will be acquired, financed and leased by non-profit local development corporations, the addition of counties and municipalities being a Maryland innovation. Maine and Rhode Island, like Maryland, provide for a "non-lapsing revolving" mortgage insurance fund, to which shall be credited the Authority's income, including mortgage insurance premiums, and against which there shall be charged the expenses of the Authority, including payments occasioned by defaults.

Maine and Rhode Island provide that if, in the opinion of the Authority, additions to the insurance fund are required in order to enable the Authority to meet its expenses, the Authority can call on the governor, who must seek an appropriation from the legislature, and failing in this, the fund shall be supplemented by the sale of bonds, not to exceed $40,000,000 in aggregate principal amount in each state, for the repayment of which the faith and credit of the state is pledged.

The constitutionality of the Maine Act was upheld in *Opinion of the Justices,* 153 Me. 202, 136 A. 2d 528 (1957) and in *Martin v. Maine Savings Bank,* 154 Me. 259, 147 A. 2d 131 (1958) as was Rhode Island's in *Opinion to the Governor,* 88 R. I. 202, 145 A. 2d 87 (1958). The manner in which the constitutional problem was resolved is of particular interest. Prior to the adoption of the Maine Act in 1957, Maine Constitution, art. IX, § 14 provided: "The credit of the State shall not be directly or indirectly loaned in any case." Anticipating the creation of the Maine Authority, § 14 was amended on 19 September 1957, so that it then read: "The credit of the State shall not be directly or indirectly loaned in any case, *except as provided in Section 14-A"* (emphasis supplied) and at the same time, a new § 14-A was added, which provided:

> "For the purposes of fostering, encouraging and assisting the physical location, settlement and resettlement of industrial and manufacturing enterprises within the State, the Legislature by proper enactment may insure the payment of mortgage loans on the real estate within the State of such industrial and manufacturing enterprises not exceeding in the aggregate $20,-000,000 [14] in amount at any one time and may also appropriate moneys and authorize the issuance of bonds on behalf of the State at such times and in such amounts as it may determine to make payments insured as aforesaid."

The situation in Rhode Island was slightly different. Rhode Island Constitution, art. XXXI, § 1 provides:

> "The general assembly shall have no powers, hereafter, without the express consent of the people, to incur state debts in an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion; *nor shall they in any case, without such consent, pledge the faith of the state for the payment of the obligations of others.* * * *"* (Emphasis supplied)

---

14. Increased in 1964 to $40,000,000.

Approval of the guaranty of mortgages in an amount of $30,-000,000 was given by popular vote on 4 November 1958.

The Rhode Island Act, although held to be constitutional in *Opinion to the Governor, supra,* 88 R. I. 202, 145 A. 2d 87 (1958) has had its difficulties. *In re Opinion to the Governor,* 90 R. I. 135, 155 A. 2d 602 (1959) held that a luxury motor hotel did not qualify as an industrial project. *Opinion to the Governor,* R. I. , 212 A. 2d 64 (1965) struck down a proposed increase to $40,000,000 in the aggregate amount of mortgages to be outstanding because the proposition submitted to the voters did not inform "them as to the nature and extent of the pertinent legislation and clearly and reasonably [disclose] to them the nature and extent of the power to pledge the state's credit for which the consent is sought." 212 A. 2d at 66.

Virginia has resolved its problem in a somewhat different fashion. *Button v. Day,* decided by the Supreme Court of Virginia in January of this year, 208 Va. 494, 158 S. E. 2d 735 (1968) dealt with the validity of the Virginia Industrial Building Act, Virginia Code, §§ 2.1-64.4 to 2.1-64.14. The Virginia Act created a seven member Industrial Building Authority, specifically empowered to guarantee mortgages made by the owners of industrial properties to the extent of 40% of cost and set up a mortgage guarantee fund to all intent like Maryland's. The Act specifically provided *that guaranties were not to be deemed a pledge of the faith or credit* of the Commonwealth. § 185 of the Virginia Constitution provides that "[n]either the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association or corporation." The court held the statute, despite its provision that faith and credit were not pledged, violated the constitutional prohibition and noted in its opinion that steps had been taken by constitutional amendment to permit the guarantee of industrial mortgages by the Authority.

Lechner, *op. cit.,* at p. 26 says that the Maine and Rhode Island plans were subsequently followed by Connecticut, New Hampshire, Vermont, Pennsylvania and Delaware. A brief review of the situation in those states is interesting. Pennsylvania

adopted its industrial mortgage insurance scheme in 1963, Purdon's Penna. Stat. Ann., tit. 73, §§ 320.1 to 320.14 but repealed it in 1965 and now makes direct loans to industrial development agencies under its Industrial Development Authority Act, tit. 73, §§ 301 ff.

Connecticut (Conn. Gen. Stat. Ann., tit. 32, § 10 ff.), New Hampshire (N. H. Rev. Stat. Ann., ch. 162-A:1 ff. 1967 Supp.) and Vermont (Vt. Stat. Ann., tit. 10, ch. 11, §§ 201 ff.) adopted similar plans, but under circumstances where none of the states has a constitutional prohibition against a pledge of faith and credit,[15] and the only constitutional question appears to be that of the existence of a public purpose. *See,* for example, *Opinion of the Justices,* 103 N. H. 258, 169 A. 2d 634 (1961) construing N. H. Constitution Pt. 2, art. 5.

Delaware (Del. Code Ann., tit. 6, §§ 7001 ff.) permits its Industrial Building Commission to pledge the faith and credit of the state to the guaranty of bonds issued or obligations incurred by development corporations, but Delaware Constitution, art. VIII, § 4 permits a pledge of the state's credit pursuant to an act passed with a three-quarter majority of all members of the general assembly, which was obtained. *In re Opinion of the Justices,* 54 Del. (IV Storey) 366, 177 A. 2d 205, 209-10 (1962).

The situations in the seven states are not sufficiently parallel to be of much help. In Maine and Rhode Island, the mortgagors were non-profit development corporations; in Maryland, at least to date, they are counties and municipalities, although local development corporations may qualify as mortgagors under our Act. In Virginia, the industry itself was the mortgagor. Maine and Rhode Island regarded the creation of the mortgage insurance fund as being sufficiently in the nature of a pledge of the state's faith and credit to require that constitutional formalities be observed. Virginia reached the same result despite the fact that her Act specifically denied that a pledge of

---

15. Connecticut, New Hampshire and Vermont are members, with Mississippi and Tennessee, of the small group of states which have no constitutional limitation on borrowing power. Heins, *op. cit.,* at 12.

faith and credit was involved. Pennsylvania apparently abandoned the scheme before it was challenged; in Connecticut, New Hampshire and Vermont there was no constitutional bar to a pledge of faith and credit, and in Delaware, the constitutional requirement was satisfied by legislative action.

Had Maryland chosen to fund the guaranty by appropriations to the Authority, no problem would have arisen. It was the pledge of the State's credit to support the Authority's guaranty of loans indefinite in duration and uncertain in amount, to be made in aid of private industry for the repayment of which the counties and municipalities themselves are not responsible, which was fatal.

Since *Meadow-Croft* held the Act, excepting only § 266 L as it read prior to the 1966 amendment, to be constitutional and valid, we regard that decision as determinative of the other issues raised by Helfrich.

> *Decree affirmed; costs to be paid by appellant, Maryland Industrial Development Financing Authority.*