# IN THE SUPREME COURT OF IOWA

No. 12–1378

Filed January 31, 2014

**STAR EQUIPMENT, LTD.,**

    Appellant,

vs.

**STATE OF IOWA, IOWA DEPARTMENT OF TRANSPORTATION,**

    Appellee,

and

**MANATT'S, INC.** and **SHORT'S CONCRETE CUTTING CO.,**

    Appellants.

---

Appeal from the Iowa District Court for Adair County, John D. Lloyd, Judge.

Subcontractors appeal ruling on scope of remedies under Iowa Code section 573.2 for unpaid work on state project. **REVERSED AND REMANDED WITH INSTRUCTIONS**.

Stephen D. Marso of Whitfield & Eddy, P.L.C., Des Moines, for appellant Manatt's, Inc.

Steven P. DeVolder of The DeVolder Law Firm, Norwalk, for appellant Short's Concrete Cutting Co.

Timothy J. Van Vliet and David L. Wetsch of Wetsch, Abbott & Osborn, P.L.C., Des Moines, for appellant Star Equipment, Ltd.

Thomas J. Miller, Attorney General, and Noel C. Hindt, Assistant Attorney General, for appellee.

**WATERMAN, Justice.**

This appeal presents questions of first impression on the meaning and constitutionality of Iowa Code section 573.2 (2011). That statute governs subcontractors' remedies for unpaid work on public improvements when the state waives the performance bond for a general contractor that is a "Targeted Small Business" (TSB). Three subcontractors obtained default judgments against a TSB, which remain unsatisfied. The district court ruled that, in the absence of a bond, the subcontractors' remedy *against the state* is limited to the funds the Iowa Department of Transportation (IDOT) retained on its contract with the TSB. The subcontractors argue section 573.2 allows broader recovery rights, requiring IDOT to step into the TSB's shoes to pay the balances owed them for work on the public project. IDOT argues the district court's ruling correctly interpreted the statute to limit its obligation to the retained funds. IDOT alternatively argues that the subcontractors' interpretation would violate a constitutional prohibition on extending state credit to private entities. *See* Iowa Const. art. VII, § 1.

For the reasons explained below, we construe section 573.2 as a waiver of sovereign immunity that allows subcontractors to recover from IDOT the unpaid balances TSBs owe for work on public improvements. Our interpretation effectuates the legislature's intent to encourage the use of TSBs on state projects and expand the remedies available to subcontractors upon a TSB's default. We reject IDOT's constitutional challenge because article VII, section 1 of the Iowa Constitution does not prohibit state reimbursement for subcontractors' work on public improvements owned by the state. Accordingly, we reverse the district court's ruling and remand this case for further proceedings on the subcontractors' claims against IDOT for unpaid work and attorney fees.

## I. Background Facts and Proceedings.

In 2010, IDOT hired Universal Concrete, Ltd. as the general contractor for two public construction contracts. The purpose of these projects was to improve the rest areas along Interstate 80 in Adair County. Universal Concrete was a TSB, which is defined as a small business that is located in Iowa; operated for profit; has an annual gross income below $4 million; and is at least fifty-one percent owned, operated, and actively managed by minorities, women, or persons with disabilities. Iowa Code § 15.102. Because Universal Concrete qualified as a TSB, IDOT waived the requirement of a construction surety bond to guarantee the company's performance on the contract. *See* Iowa Code § 12.44 (setting forth when bond can be waived for TSB).

Universal Concrete subcontracted with Star Equipment, Manatt's, and Short's Concrete. Star Equipment supplied rental equipment, Manatt's furnished ready-mix concrete, and Short's Concrete provided cement cutting services. No direct contractual relationship existed between IDOT and the subcontractors. The contract between Universal Concrete and IDOT expressly stated there were no third-party beneficiaries. IDOT paid Universal Concrete under the terms of their contract, and it was Universal Concrete's responsibility in turn to pay its subcontractors.

The rest stop improvements were completed in 2011, and IDOT gave its final acceptance of the projects on September 1 of that year. Universal Concrete, however, failed to pay in full the three subcontractors for the work they performed. There was no surety bond against which the subcontractors could seek compensation, but IDOT had retained $3436.75 that it owed Universal Concrete. Star Equipment, Manatt's, and Short's Concrete filed claims with IDOT seeking

reimbursement for their outstanding balances, claiming $10,851.44, $15,685.55, and $5775, respectively.

On October 13, 2011, Star Equipment filed this civil action against Universal Concrete and IDOT, as well as against Manatt's and Short's Concrete to adjudicate their competing interests in the funds retained by IDOT. Manatt's and Short's Concrete filed answers, counterclaims, and cross-claims. The subcontractors each contended Iowa Code section 573.2 imposes liability on IDOT for the amount that their claims exceeded the retained funds. They also sought attorney fees and interest. Universal Concrete failed to respond and was found in default.

IDOT agreed that the subcontractors were entitled to payment from the retained funds, but filed a motion to dismiss or strike the subcontractors' claims against it for amounts that exceeded the retainage. IDOT argued its obligation to reimburse the subcontractors without a bond was limited to the retainage. IDOT further argued that interpreting Iowa Code section 573.2 to require IDOT to pay the overage on such claims would compel the state to act as a surety for the TSB, in violation of article VII, section 1 of the Iowa Constitution.

On January 20, 2012, the district court granted IDOT's motion to dismiss the subcontractors' claims to the extent they exceeded the retained funds. The district court explained that

> [u]nder the scheme established in chapter 573, a subcontractor or supplier generally has a claim against the principal and the surety on the performance bond and against the public corporation to the extent of the amount retained from the payments to the contractor.

(Footnote omitted.) The district court concluded:

> This court finds nothing in section 573.2 that creates or expands the liability of the public corporations under the statutory scheme of chapter 573 and accordingly finds no

basis on which these claimants can recover against the DOT for any amounts in excess of the retainage.

Because the court concluded the statute did not require IDOT to pay claims in excess of the retainage, the court did not reach the constitutional issue. Manatt's sought an interlocutory appeal of this order, which our court denied.

Subsequently, the district court ruled on the subcontractors' respective motions for summary judgment against Universal Concrete. Universal Concrete did not participate in the proceedings. The district court entered unresisted summary judgments in favor of each subcontractor and noted Universal Concrete was in default. First, on July 3, the district court awarded all of the retained funds to Manatt's because it had filed its IDOT claim first. This left a balance of $12,248.80. The district court entered judgment against Universal Concrete for this amount, with interest, costs, and later, attorney fees of $11,936. On July 20, the district court granted Short's Concrete's motion for summary judgment against Universal Concrete, awarding $5775 in damages and $5500 in attorney fees with interest. Finally, on September 24, the court granted Star Equipment's motion for summary judgment against Universal Concrete, awarding $10,851.44 in damages and $2560 in attorney fees plus interest.

Manatt's and Short's Concrete filed a joint appeal and Star Equipment filed a separate appeal. We consolidated and retained the appeals. The subcontractors seek reversal of the district court's ruling on IDOT's motion to dismiss. The subcontractors argue the court erred in ruling IDOT is not liable for claims exceeding the retainage amount when IDOT has waived the bond requirement. They also request that

IDOT be required to pay the attorney fees they incurred in district court and on appeal. Universal Concrete is not a party to this appeal.

## II. Scope of Review.

We review rulings on motions to dismiss for correction of errors at law. *Rees v. City of Shenandoah*, 682 N.W.2d 77, 78 (Iowa 2004). We review the district court's interpretation of a statute for correction of errors at law. *L.F. Noll Inc. v. Eviglo*, 816 N.W.2d 391, 393 (Iowa 2012). "We review constitutional claims de novo." *Ames Rental Prop. Ass'n v. City of Ames*, 736 N.W.2d 255, 258 (Iowa 2007).

## III. Analysis.

The subcontractors seek payment from IDOT under Iowa Code chapter 573 for their unpaid work improving state-owned rest stops on Interstate 80. The subcontractors' default judgments against Universal Concrete, the TSB general contractor hired and paid by IDOT, remain unsatisfied. Because mechanic's liens do not attach to government-owned facilities, chapter 573 was enacted to provide other protections to secure payment for those working on public improvements. *See Farmers Coop. Co. v. DeCoster*, 528 N.W.2d 536, 537 (Iowa 1995) (stating chapter 573 "secure[s] or protect[s] the persons performing work or providing materials" on public improvements); *Lennox Indus., Inc. v. City of Davenport*, 320 N.W.2d 575, 577 (Iowa 1982) (noting chapter 573 "protect[s] contributors to public work projects because normally it is impossible to obtain a lien on public property"). Subcontractors on public improvements left unpaid by the general contractor ordinarily would collect from funds retained by the state or through claims against a surety bond. Iowa Code §§ 573.16, .18, .22. The retained funds in this case were insufficient, and IDOT had waived the bond.

This appeal presents our first opportunity to decide whether Iowa Code section 573.2, as amended in 1988, requires IDOT to pay more than the retained funds to subcontractors shortchanged by a TSB general contractor. We hold section 573.2 requires IDOT to step into the shoes of the TSB general contractor to pay subcontractor claims for unpaid work on public improvements when retained funds are insufficient and the bond had been waived. We reach this conclusion based on the text of the statute, its legislative history, and its purpose. We further hold this interpretation does not require the state to act as a surety, and therefore, we reject IDOT's constitutional challenge under article VII, section 1. To give context to the parties' statutory and constitutional arguments, we first examine the structure and purposes of chapter 573.

**A. An Overview of Chapter 573.** Entitled "Labor and Material on Public Improvements," chapter 573 is Iowa's counterpart to the Federal Miller Act. *Lennox Indus.*, 320 N.W.2d at 577 (citing Miller Act, 40 U.S.C. §§ 270a–d (1979 & Supp. IV 1980)). Chapter 573 protects subcontractors and materialmen through retainage procedures and by requiring general contractors to obtain surety bonds for state government construction projects. *See Iowa Supply Co. v. Grooms & Co. Constr., Inc.*, 428 N.W.2d 662, 665–66 (Iowa 1988).

Bonds on public projects serve as a substitute for the protection of mechanics' liens, which are unavailable when the landowner is the government:

> To provide protection in public works projects for contractors, subcontractors and materialmen unable to utilize a mechanic's lien, chapter 573 requires that the general contractor execute and deliver a bond running to the public corporation sufficient to insure the fulfillment of the conditions of the contract. *See* Iowa Code §§ 573.2, .5

(1987).  This bond can be the object of a subcontractor's or materialman's claim, *see* Iowa Code § 573.7 (1987), and serves as a substitute for the protection of a mechanic's lien.

*Id.* at 665.  Iowa Code section 573.5 (2011) states that the amount of the bond must be "sufficient to comply with all requirements of [the] contract and to insure the fulfillment of every condition, expressly or impliedly embraced in [the] bond."  Bonds are typically required on all projects when the contract price equals or exceeds $25,000 and may also be required for contracts below that threshold.  *Id.* § 573.2.

A performance bond underwriter assesses "the unique characteristics of a given principal and only issues a bond if claims are not expected."  Thomas J. Vollbrecht & Jacqueline Lewis, *Creation of the Relationship*, *in The Law of Performance Bonds* 6–7 (Lawrence R. Moelmann, et al. eds., 2d ed. 2009) [hereinafter Vollbrecht] (emphasis omitted) (contrasting bond underwriters against insurance underwriters, who issue insurance based on the risk assessment of a generalized pool, and noting that bond principals are expected to indemnify the surety).  The capital of the principal is an important consideration in bond underwriting, and a surety will likely refuse to issue a bond if the principal does not have adequate financing, cash flow, and financial reporting.  *Id.* at 7.  Bonds can represent a significant cost: Premiums for construction bonds often fall in a range of one to three percent of the amount of the bonded contract.  William Schwartzkopf, *Practical Guide to Construction Contract Surety Claims* § 2.04 (current through 2014 Cumulative Supp.), http://www.westlaw.com (last visited Jan. 17, 2014).  "The bond premium is effectively an administrative fee based upon the surety's assessment that its underwriting is sufficiently rigorous that there will be few or no defaults under its bonded contracts."  Vollbrecht at 7.

Chapter 573 provides an additional protection for subcontractors in the form of a retained percentage fund. Section 573.12(1) requires the state entity, or "public corporation," in charge of the project to pay the general contractor monthly. Iowa Code § 573.12(1). From the amount payable to the general contractor, the public corporation is allowed—but not required—to retain up to five percent of the amount owed.[1] *See id.* Section 573.13 specifies that the retained amount "constitutes a fund for the payment of claims for materials furnished and labor performed." *Id.* § 573.15 (providing under what circumstances the retained amounts may be used to pay those who have furnished materials).

Subcontractors owed money on public construction projects may submit their claims to the responsible public corporation. *Id.* § 573.16. If necessary, the court is tasked with adjudicating these claims and is directed to award a claimant the costs of the action. *Id.* § 573.18. The court may tax reasonable attorney fees as costs. *Id.* § 573.21. If the retained percentage is sufficient, the public corporation pays the claimants from that fund. *Id.* § 573.18. If no claims are submitted against the retained funds, or if excess funds remain after all claims have been satisfied, the balance is released to the general contractor. *Id.* § 573.14.

**B. Statutory Construction.** This appeal arises due to the exception to the bond requirement for TSBs and the parties' disagreement regarding the meaning of a 1988 amendment to section 573.2. Iowa Code section 12.44, enacted in 1987, requires state agencies to waive the bond requirement for TSBs that "are able to

---

[1]The general contractor is also authorized by section 573.12(1) to retain five percent from the amount it owes its subcontractors. Iowa Code § 573.12(1).

demonstrate the inability of securing such a bond because of a lack of experience, lack of net worth, or lack of capital."[2]

We now turn to the operative statutory language at issue. *See State v. DeCamp*, 622 N.W.2d 290, 294 (Iowa 2001) ("[O]ur first task is to look to the language of the statute to determine the legislative intent."). The second paragraph of Iowa Code section 573.2 refers to the TSB bond waiver and states:

> If the requirement for a bond is waived pursuant to section 12.44, a person, firm, or corporation, having a contract with the targeted small business or with subcontractors of the targeted small business, for labor performed or materials furnished, in the performance of the contract on account of which the bond was waived, *is entitled to any remedy provided under this chapter.* When a bond has been waived pursuant to section 12.44, the

---

[2]Section 12.44 was adopted as a part of a larger bill that also established a targeted small business linked deposit program. 1987 Acts ch. 233, §§ 128, 129 (codified at Iowa Code §§ 12.43–.44 (Supp. 1987)). In its current form, section 12.44 states in full:

> Agencies of state government shall be required to waive the requirement of satisfaction, performance, surety, or bid bonds for targeted small businesses which are able to demonstrate the inability of securing such a bond because of a lack of experience, lack of net worth, or lack of capital. This waiver shall not apply to businesses with a record of repeated failure of substantial performance or material breach of contract in prior circumstances. The waiver shall be applied only to a project or individual transaction amounting to fifty thousand dollars or less, notwithstanding section 573.2. In order to qualify, the targeted small business shall provide written evidence to the department of inspections and appeals that the bond would otherwise be denied the business. The granting of the waiver shall in no way relieve the business from its contractual obligations and shall not preclude the state agency from pursuing any remedies under law upon default or breach of contract.
>
> The department of inspections and appeals shall certify targeted small businesses for eligibility and participation in this program and shall make this information available to other state agencies.
>
> Subdivisions of state government may also grant such a waiver under similar circumstances.

Iowa Code § 12.44 (2011).

remedies provided for under this paragraph *are available in an action against the public corporation.*

(Emphasis added.)

The 1988 Senate File that added this second paragraph to section 573.2 begins by stating the bill is "[a]n Act relating to claims against public corporations for nonpayment of moneys due on public improvements." S.F. 2271, 72d G.A., 2d Sess. (Iowa 1988). The final version of the Senate File also included an explanation stating:

> This bill *extends* the remedies afforded a person contracting with a bond-paying public contractor to a person, firm, or corporation contracting with a targeted small business when a bond requirement has been waived pursuant to section 12.44.

*Id.* (emphasis added). " '[W]e give weight to explanations attached to bills as indications of legislative intent.' " *Root v. Toney*, 841 N.W.2d 83, 88 (Iowa 2013) (quoting *City of Cedar Rapids v. James Props., Inc.*, 701 N.W.2d 673, 677 (Iowa 2005)).[3] We have not had occasion to interpret section 573.2 as amended in 1988.

"The goal of statutory construction is to determine legislative intent." *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa

---

[3]The legislature enacts the bill—not the accompanying explanation. But, the internal rules governing the general assembly require the title and explanation to be accurate. *See* Iowa Senate Rule 28 ("The subject of every bill shall be expressed in its title."); *id.* r. 29 ("No bill . . . shall be introduced unless a concise and accurate explanation is attached."); Iowa House Rule 27 ("All bills . . . introduced shall be prepared by the legislative services agency with title, enacting clause, text and explanation as directed by the chief clerk of the house."); Iowa Legislative Services Agency, *Iowa Bill Drafting Guide and Style Manual* (2013 Iowa Law CD-ROM, partially updated Aug. 2012) ("House and Senate bills . . . must have explanations of their contents, which explanations follow the body of the document. . . . An explanation of a bill written by a bill drafter must be concise and accurate, explaining exactly what the bill does, without attempting to comment upon its merits or editorializing."). An explanation or title included when a bill is introduced may become irrelevant when the text of the bill is materially changed by subsequent amendments. But, when the explanation accompanies the text of the bill enacted without a relevant substantive change, the explanation is part of the legislative history that can be examined in our efforts to determine the meaning of the text.

2004).  We construe chapter 573 " 'liberally with a view to promoting its objects and assisting the parties in obtaining justice.' "  *Lennox Indus.*, 320 N.W.2d at 578 (quoting *Dobbs v. Knudson, Inc.*, 292 N.W.2d 692, 694 (Iowa 1980)).  "We derive legislative intent not only from the language used but also from the statute's subject matter, the object sought to be accomplished, the purpose to be served, underlying policies, remedies provided, and the consequences of the various interpretations."  *Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 49 (Iowa 2012) (internal quotation marks omitted).  The purpose of chapter 573 is to protect subcontractors and materialmen against nonpayment.  *See DeCoster*, 528 N.W.2d at 537–38.

The subcontractors argue the second paragraph of section 573.2 entitles them to collect from IDOT the amounts owed by the TSB when the bond has been waived and the retained funds are insufficient.  Their interpretation fits with the plain text of the statute and with the legislative explanation accompanying the statutory amendment adding this provision.  IDOT counters that the provision merely confirms that subcontractors are entitled to seek compensation from the retained percentage when the bond requirement has been waived.  IDOT candidly concedes that under its interpretation section 573.2 provides the same remedies with or without the second paragraph.  Under IDOT's interpretation, the second paragraph is surplusage, and the amendment adding that provision left the statute unchanged.

Our problem with IDOT's interpretation is that it flies in the face of our rules of statutory construction.  "[W]hen the legislature amends a statute, it raises a presumption that the legislature intended a change in the law."  *Postell*, 823 N.W.2d at 49.  Moreover, "we do not interpret statutes so they contain surplusage."  *Thomas v. Gavin*, 838 N.W.2d 518,

524 (Iowa 2013); *see also* Iowa Code § 4.4(2) ("In enacting a statute, it is presumed that . . . [t]he entire statute is intended to be effective."); *State v. Keutla,* 798 N.W.2d 731, 734 (Iowa 2011) ("We seek an interpretation that does not render portions of [a statute] redundant or irrelevant."). We therefore reject IDOT's argument that the second paragraph of section 573.2 merely confirms the retainage remedy. To the contrary, we conclude the legislature intended the second paragraph of section 573.2 to provide additional remedies for subcontractors of a TSB owed money for their work on public improvements.

The legislature knows how to limit remedies for those working on state projects. *See, e.g.,* Iowa Code § 573.7 ("A person furnishing only materials to a subcontractor who is furnishing only materials is not entitled to a claim against the retainage or bond under this chapter . . . ."). If the legislature had intended to limit the remedy of subcontractors of TSBs to the retainage, it could have said exactly that. *Cf. Oyens Feed & Supply, Inc. v. Primebank,* 808 N.W.2d 186, 194 (Iowa 2011) ("If the legislature had intended to subordinate a dealer's priority under section 570A.5(3), it would have expressly said so as it did in subsection (2).").

We agree with the subcontractors that the plain language of section 573.2 requires IDOT to step into the shoes of the TSB. The first sentence of its second paragraph states that when the bond is waived, the TSB's subcontractor "is entitled to any remedy provided under this chapter." Iowa Code § 573.2. Those remedies include obtaining a judgment against the general contractor for unpaid work. *See id.* § 573.6(1) (requiring principal to pay subcontractor for work performed);

*id.* § 573.22 (allowing judgment against "principal" for unpaid sums).[4] Section 573.2 provides in its final sentence that when a bond is waived for a TSB, "the remedies provided for under this paragraph are available in an action *against the public corporation*." *Id.* § 573.2 (emphasis added). This plainly means the subcontractors are entitled to pursue such remedies against the public corporation, IDOT in this case. Reading the first and second sentences together, the remedies available against IDOT are the same remedies available to subcontractors against general contractors and sureties under chapter 573 as a whole, including a deficiency judgment for unpaid work, as well as interest, costs, and reasonable attorney fees. *Id.* § 573.18 (allowing for claims for unpaid labor and materials, plus costs of the action, and interest); *id.* § 573.21 (allowing reasonable attorney fees); *id.* § 573.22 (allowing judgment against principal or surety for unpaid amounts).

Our construction of section 573.2 effectuates the legislature's purpose in enacting sections 12.44 and 573.2. *See Hook v. Trevino*, 839 N.W.2d 434, 444 (Iowa 2013) (" 'We seek a reasonable interpretation that will best effect the purpose of the statute . . . .' " (quoting *Harden v. State,* 434 N.W.2d 881, 884 (Iowa 1989)). The purpose of chapter 573 as a whole is to protect subcontractors and materialmen against the risk of nonpayment on public projects. *See Iowa Supply*, 428 N.W.2d at 665. The specific purpose of the 1988 amendment to section 573.2 is to *extend* protections for subcontractors when the bond is waived for a TSB.

---

[4]Chapter 573 makes clear that the general contractor is the principal on the bond. The first paragraph of section 573.2 states, "Contracts for the construction of a public improvement shall . . . be accompanied by a bond." Iowa Code § 573.2. Section 573.3 requires the "contractor to execute and deliver said bond . . . ." *Id.* § 573.3. Section 573.6(1) refers to the obligation of the "principal and sureties" to pay those "having contracts directly with the principal or subcontractors, all just claims due them for labor performed or materials furnished." *Id.* § 573.6(1).

The TSB program in turn is "designed to help women, minorities and the disabled overcome some of the major hurdles to starting or growing a small business in Iowa." Iowa Economic Development, *Targeted Small Business*, http://www.iowaeconomicdevelopment.com/Entrepreneurial/ TSB (last visited Jan. 24, 2014). Waiving construction bonds for TSBs who would be unable to obtain a bond allows them to compete for government contracts.[5] We presume the legislature amended section 573.2 to encourage persons to do business with TSBs by replacing the security provided by a bond with the financial backing of the state to ensure payment in full despite a TSB's default. Our interpretation furthers the legislative goals of promoting TSBs while protecting their subcontractors and materialmen from defaults.

By contrast, IDOT's interpretation would undermine both goals. The bond waiver allows businesses owned by women, minorities, and the disabled to better compete for government projects despite their "inability [to secure] a bond because of a lack of experience, lack of net worth, or lack of capital." Iowa Code § 12.44. A business unable to secure a bond is likely less financially stable than one that is bondable. As such, the bond waiver removes the protection of a bond in circumstances in which there is increased risk. The legislature made the policy choice that the benefit of encouraging TSBs outweighs the increased financial risk of awarding a project to an unbondable business and that the state should bear the risk of default.[6] IDOT would have this increased risk of

---

[5]This is only one of the ways in which the state seeks to foster TSBs. *See* Iowa Code § 73.16 (requiring government entities to procure goods and services from TSBs); *id.* § 15.108(7), (10) (instructing the Economic Development Authority to provide assistance to TSBs and requiring reports regarding TSB activity); *id.* § 714.8(13) (criminalizing fraudulently claiming to be a TSB).

[6]The public corporation retains the right to pursue remedies against the general contractor. *See* Iowa Code § 12.44 ("The granting of the [bond] waiver shall in no way

nonpayment fall on the subcontractors. The practical consequence of such an interpretation would be that fewer subcontractors would be willing to work for TSBs. This would limit the business opportunities available to TSBs bidding on state projects.

For these reasons, we conclude the district court erroneously interpreted section 573.2. Section 573.2 permits the subcontractors to recover from IDOT amounts they could have recovered from the surety if IDOT had not waived the bond. We reject IDOT's sovereign immunity argument because section 573.2, so interpreted, constitutes the state's express consent to be sued. *See Anthony v. State*, 632 N.W.2d 897, 902 (Iowa 2001) (holding Iowa Code chapter 91A, which allows employees to sue the state for wages owed, is an express waiver of sovereign immunity).

**C. Constitutionality of Section 573.2.** We must now reach IDOT's argument that section 573.2, so interpreted, is unconstitutional under article VII, section 1 of the Iowa Constitution.[7] Our review of the text, history, and purpose of that provision persuades us that IDOT's constitutional challenge fails.

We begin with the well-established principles governing our review of constitutional challenges:

> "We review constitutional challenges to a statute de novo. In doing so, we must remember that statutes are

---

relieve the business from its contractual obligations and shall not preclude the state agency from pursuing any remedies under law upon default or breach of contract.").

[7]Manatt's and Star Equipment argue we lack subject matter jurisdiction to reach the constitutional issue because it was not decided by the district court and we are a court of appellate, not original, jurisdiction under article V, section 4 of the Iowa Constitution. We disagree. We are exercising appellate review of the district court's ruling. IDOT raised the constitutional challenge in district court and on appeal as an alternative ground for affirming the dismissal. We may decide an issue presented to, but not decided by, the district court when it is urged on appeal by the appellee as an alternative ground for affirmance. *DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002).

cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt. Moreover, the challenger must refute every reasonable basis upon which the statute could be found to be constitutional."

*State v. Thompson*, 836 N.W.2d 470, 483 (Iowa 2013) (citations omitted) (quoting *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005)) (internal quotation marks omitted).

First and foremost, we give the words used by the framers their natural and commonly-understood meaning. However, we may also examine the constitutional history and consider the object to be attained or the evil to be remedied as disclosed by the circumstances at the time of adoption.

*State v. Briggs*, 666 N.W.2d 573, 578 (Iowa 2003) (citation and internal quotation marks omitted).

Article VII of the Iowa Constitution pertains to state debts and section 1 of that article is entitled "Credit not to be loaned." It provides:

The credit of the state shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; and the state shall never assume, or become responsible for, the debts or liabilities of any individual, association, or corporation, unless incurred in time of war for the benefit of the state.

Iowa Const. art. VII, § 1.[8] We discussed the historical underpinnings of article VII, section 1 in *Grout v. Kendall*:

This particular section of our Constitution was taken bodily from the Constitution of New York. As a part of the Constitution of New York, it was the result of past experience in the history not only of New York, but of other states as well, whereby aspiring new states had loaned their credit freely and extravagantly to corporate enterprises which had in them much seductive promise of public good. These enterprises included railways, canals, water powers, etc. The corporate body in each case was the primary debtor; the

---

[8]Thirty-eight other states have adopted a similar constitutional provision. Ralph L. Finlayson, *State Constitutional Prohibitions Against Use of Public Financial Resources in Aid of Private Enterprises*, 1 Emerging Issues St. Const. L. 177, 181 & n.9 (1988).

state became the underwriter; it loaned its credit always with the assurance and belief that the primary debtor would pay. Pursuant to these secondary liabilities, the state became overwhelmed with millions of dollars of indebtedness which never would have been undertaken as a primary indebtedness, and which never would have been permitted by public sentiment, if it had been known or believed that the secondary liability would become a primary one through the universal failure of the primary debtor.

195 Iowa 467, 472–73, 192 N.W. 529, 531 (1923).[9]  As we stated in *Grout*, "The ultimate cry of the surety is: I would not have become surety if I had known or believed that I should have to pay the debt."  *Id.* at 473, 192 N.W. at 531.  Thus, Iowa adopted article VII, section 1 to protect against the "delusion of suretyship with its snare of temptation."  *Id.*

We held in *Grout*, "[n]o public purpose can be meritorious enough, and no obligation of equity appealing enough, to override [article VII, section 1]."  *Id.* at 472, 192 N.W. at 531.  Unlike Iowa, other states have interpreted their constitutional provisions to allow the lending of state

---

[9]"Governor Wright of New York in 1845 reported that more than three-fifths of the debt chargeable on the general fund had been incurred by loans of the state's credit to railroad corporations which subsequently failed."  *Utah Tech. Fin. Corp. v. Wilkinson*, 723 P.2d 406, 410 (Utah 1986) (citing *Grout* in its discussion of the historical context of Utah's credit clause).

A historian has explained why many state-financed canals failed due to competition from railroads:

Most canals were financed by the States, hoping to enhance their economic development.

In the 1850s, it was an even contest between the canals and railroads for dominance.  But, soon, the interior canals were operating in the shadow of the railroads.  Many canals were eventually abandoned.

. . . .

Compared to canals, railroad construction was not as seriously challenged by topography.  Moreover, many canals were frozen and inoperable during winter months.  As a result, railroads were found to be a more economical, reliable, and expeditious means of transport, and many canals soon fell into decline and disuse.

Paul Stephen Dempsey, *Transportation: A Legal History*, 30 Transp. L.J. 235, 246–47 (2003) (footnote omitted).

credit to private parties or the state assumption of private debt if a "public purpose" is served. *See* Ralph L. Finlayson, *State Constitutional Prohibitions Against Use of Public Financial Resources in Aid of Private Enterprises*, 1 Emerging Issues St. Const. L. 177, 190–93 (1988) (collecting cases). We agree with the criticism of the public-purpose test:

> It will not do to say that the character of the act is to be judged by its main object; that, because the purpose is public, the means adopted cannot be called a gift or a loan. To do so would be to make meaningless the provision adopted by the convention of 1846. Gifts of credit to railroads served an important public purpose. That purpose was distinctly before the Legislatures that made them. Yet they were still gifts and so were prohibited.

*People v. Westchester Cnty. Nat'l Bank of Peekskill*, 132 N.E. 241, 244 (N.Y. 1921).[10] To engraft by judicial gloss a vague and open-ended public purpose exception[11] in article VII, section 1 would undermine this

---

[10]We note that New York has moved away from this strict construction of their constitutional provision. Over two dissents, the New York Court of Appeals recently held that "appropriations to the State Department of Agriculture and Markets to fund agreements with not-for-profit organizations for the promotion of agricultural products grown or produced in New York" were valid because the appropriations had "a predominant public purpose and any private benefit [was] merely incidental." *Bordeleau v. State*, 960 N.E.2d 917, 923 (N.Y. 2011). One dissenter commented:

> Either overruling *Westchester County Nat[ional] Bank* or shrinking it beyond recognition, the majority seemingly decides that any gift or loan of money to private recipients is valid as long as it has "a predominantly public purpose." It is hard to see what is left of the constitutional prohibition.

*Id.* at 926 (Pigott, J., dissenting) (citation omitted).

[11]Courts often interpret public purpose tests expansively. *See, e.g., Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 295 (Ill. 2008) ("If the purpose sought to be achieved by the legislation is a public one and it contains elements of public benefit, then the question of how much benefit the public derives is for the legislature, not the courts."); *Jackson v. Benson*, 578 N.W.2d 602, 628 (Wis. 1998) ("Under the public purpose doctrine, '[w]e are not concerned with the "wisdom, merits or practicability of the legislature's enactment." Rather we are to determine whether a "public purpose can be conceived which might reasonably be deemed to justify or serve as a basis for the expenditure." '" (quoting *Miller's Nat'l Ins. Co. v. City of Milwaukee*, 516 N.W.2d 376, 383 (Wis. 1994))); *cf. Kelo v. City of New London*, 545 U.S. 469, 497, 125 S. Ct. 2655, 2673, 162 L. Ed. 2d 439, 462–63 (2005) (O'Connor, J., dissenting) (Four dissenters noted in the context of the Federal Takings Clause: "We give

constitutional prohibition. *Cf. Hayes v. State Prop. & Bldgs. Comm'n*, 731 S.W.2d 797, 815 (Ky. 1987) (Stephenson, J., dissenting) ("Section 177 [the Kentucky provision] does not, anywhere, mention 'public purpose.' In effect, the majority opinion has amended Section 177 by adding 'except for a valid public purpose.' "). This would open the door to the crony capitalism the framers of our state constitution sought to avoid. *See Westchester Cnty. Nat'l Bank*, 132 N.E. at 244 (noting the prohibition represents "the triumph of efforts to . . . make useless any pressure from special interests"). Accordingly, we decline to revisit our conclusion in *Grout* that a public purpose alone does not permit the state to assume the debts of private entities.

Yet, article VII, section 1 is a narrow prohibition. *Grout* recognized that the state "loans its credit" when it acts as a surety for another. *Id.* at 472, 192 N.W. at 531. We therefore held article VII, section 1 does not prohibit "the creation of a primary indebtedness for any purpose whatever." *Id.* at 473, 192 N.W. at 531. Rather, the provision only "forbade the incurring of obligations by the indirect method of secondary liability." *Id.* Applying this distinction, *Grout* rejected a challenge to the constitutionality of the Soldiers' Bonus Act of 1921, under which the state sold bonds to pay for bonuses to Iowa veterans of World War I, because the state's liability was primary.[12] *Id.* at 468–69, 484, 192 N.W. at 529, 536.

---

considerable deference to legislatures' determinations about what governmental activities will advantage the public. But were the political branches the sole arbiters of the public-private distinction, the Public Use Clause would amount to little more than hortatory fluff.").

[12]We have repeatedly rejected constitutional challenges to state statutes creating financing programs that allowed private corporations to develop projects. In each of these cases, we held that the state assumed primary liability. *See, e.g.*, *Train Unlimited Corp. v. Iowa Ry. Fin. Auth.*, 362 N.W.2d 489, 491–92, 495 (Iowa 1985) (allowing Iowa Railway Finance Authority to pay for rail facilities by issuing bonds and pledging tax

Accordingly, the question we must answer under *Grout* is whether the second paragraph of section 573.2 makes IDOT a surety for the TSB or rather imposes primary liability on IDOT to unpaid subcontractors. The key to this inquiry is whether the state benefits from the subcontractors' work. IDOT already paid Universal Concrete the contract price for the public project. To the extent IDOT must pay a second time for work performed by the subcontractors, it is paying an obligation of a private party, Universal Concrete. In that regard, IDOT is a co-obligor with the TSB. But, we conclude IDOT is not a surety as defined by our precedent because Iowa Code section 573.2 obligates IDOT to pay subcontractors for work improving *state-owned* facilities—a benefit to the state.

As we recognized in *Grout*, "[t]he liability of the surety is always secondary and not primary." *Id.* at 472, 192 N.W. at 531. Whether a public corporation's liability is considered primary or secondary depends upon the nature of its interest. A party is not considered a surety if it has a direct personal relationship in the debt and receives a benefit from the debt. 72 C.J.S. *Principal and Surety* § 12, at 187 (2005). Our court has stated, "A principal, as distinguished from a surety, . . . means the person primarily liable under the obligation *and who receives the benefit for which the obligation was given*." *Ft. Dodge Culvert & Steel Co. v. Miller*, 200 Iowa 1169, 1172, 206 N.W. 141, 142 (1925) (emphasis added). This is a long-standing and widely recognized principle. *See,*

---

receipts as security for the bonds); *John R. Grubb, Inc. v. Iowa Hous. Fin. Auth.*, 255 N.W.2d 89, 98 (Iowa 1977) (permitting state to make loans to housing sponsors to finance housing purchases); *Richards v. City of Muscatine*, 237 N.W.2d 48, 62 (Iowa 1975) (upholding city pledge to pay tax increment bonds from city taxes); *Edge v. Brice*, 253 Iowa 710, 716, 113 N.W.2d 755, 758 (1962) (finding constitutional a statute authorizing the state to reimburse utilities for their costs of relocation caused by federal highway programs).

*e.g.*, *F & M Bldg. P'ship v. Farmers & Merchs. Bank*, 871 S.W.2d 338, 341 (Ark. 1994) (holding lessor who mortgaged leased property to secure loan, on condition that it receive the majority of loan proceeds, was a coprincipal rather than a surety); *Johnson v. Jouchert,* 24 N.E. 580, 581 (Ind. 1890) ("One who has received and who retains the consideration or benefit of a contract cannot, in equity, occupy the attitude of a surety."); *Guar. Mortg. Co. of Nashville v. Ryan Supply Co.,* 363 So. 2d 739, 745 (Miss. 1978) (concluding appellants' interest was primary when appellants entered into a direct contractual relationship for their own financial benefit); *State of Wis. Inv. Bd. v. Hurst,* 410 N.W.2d 560, 563 (S.D. 1987) ("[A] person who makes a contract for the purpose of securing to himself a benefit rather than for securing to another a benefit, may be classified as a principal."); *Honey v. Davis*, 930 P.2d 908, 911 (Wash. 1997) ("[E]vidence of consideration for an obligation flowing to both obligors belies a contention that either is a surety.").

Guidance as to what constitutes primary liability is provided in our caselaw applying the statute of frauds. Under the statute of frauds, evidence of a secondary obligor's oral promise to pay the debt of another is inadmissible unless the secondary obligor made the promise for its own benefit. *See Maresh Sheet Metal Works v. N.R.G., Ltd.*, 304 N.W.2d 436, 439 (Iowa 1981). The cases differentiate between "original" and "collateral" promises. *See id.* If a promise was made for the secondary obligor's personal benefit, the promise is considered "original," and evidence of the promise is not barred by the statute of frauds. *Id.* If the promise is *not* made for the secondary obligor's personal benefit, it is a "collateral" promise, and evidence of the oral promise is inadmissible. The Restatement (Third) of Suretyship & Guaranty also reflects this rule. It notes that a secondary obligor's promise to satisfy a primary obligor's

duty "is not within the Statute of Frauds as a promise to answer for the duty of another if the consideration for the promise is in fact or apparently desired by the secondary obligor mainly for its own economic benefit." Restatement (Third) of Suretyship & Guaranty § 11(3)(c), at 42 (1996).

In *Maresh*, a defendant orally guaranteed a corporation's debts, and we were asked to decide if this promise was original or collateral. 304 N.W.2d at 438–39. The district court determined the defendant, who owned substantial stock in the corporation, was pursuing his own interests when he agreed to pay the corporation's debt. *Id.* We therefore concluded the defendant's promise was original and created a primary obligation. *Id.* at 439.

The court of appeals applied these principles in *Gallagher, Langlas & Gallagher v. Burco*, stating:

> Collateral promises are made when a promise is made in addition to an already existing contract *and the surety has no personal concern in the debtor's obligation and gains no benefit from the debtor's obligation. The "main purpose" of the promise must not be the benefit of the surety.*

587 N.W.2d 615, 618 (Iowa Ct. App. 1998) (emphasis added). The defendant in *Burco* was a father who orally guaranteed his daughter's debt for legal fees related to her child custody trial. *Id.* at 616–17. The court of appeals held the father would, at most, gain the indirect benefit of visiting his granddaughter more if his daughter won custody. *Id.* at 619. Therefore, the court of appeals concluded that the father's promise to pay his daughter's debt was not an original promise, and the statute of frauds applied to exclude evidence of his oral promise. *Id.*

We conclude that because the legislature's main purpose in obligating the state to pay subcontractors' unsatisfied claims was to

secure a benefit for the state, a primary obligation exists. IDOT has assumed primary liability as a co-obligor under section 573.2 in order to secure a state benefit—the improvement of state-owned highway rest stops.[13] IDOT owns the public improvements completed under chapter 573.[14] Thus, this case is a far cry from the *privately* owned canals and railroads whose financial collapse saddled prior state governments with financial burdens.[15]

IDOT argues its liability to subcontractors is secondary to the TSB's liability as general contractor. We rejected a similar argument in a constitutional challenge to the Iowa Tort Claims Act. In *Graham v. Worthington*, 259 Iowa 845, 865, 146 N.W.2d 626, 639 (1966), the appellant raised an article VII, section 1 challenge to the state's assumption of respondeat superior liability for the torts of state employees, arguing when "an employee of the state commits a tort, the employee is primarily liable, the state's obligation secondary, and as a

---

[13]An ancillary benefit to the state is that the bond waiver promotes TSBs by enabling them to bid on public projects.

[14]We also recognize that the state has the ability to limit its exposure to subcontractors' claims because it is the owner of these public projects. *Cf. State v. Exec. Council of State of Iowa*, 207 Iowa 923, 937, 223 N.W. 737, 743 (1929) (holding state did not violate article VII, section 1 by assuming responsibility for county road fund debts and finding no apparent reason "why the state may not at any time exert its power over the construction and maintenance of the highways"). For instance, the state could issue checks payable jointly to the contractor and subcontractor. *See, e.g.*, *Iowa Supply Co.*, 428 N.W.2d at 664–66 (recognizing that joint-payee checks are used "as a method of insuring" payment to a materialman or subcontractor and holding the joint-payee check rule applies to public improvement projects). Moreover, section 12.44 limits the state's exposure by restricting the bond waiver to projects in which the contract value is less than $50,000. *See* Iowa Code § 12.44.

[15]Even when the state did have security for its debts, such security was sometimes later found to have little or no value. The first mortgage lien on the New York and Erie Railroad Company's assets securing [a] $3 million loan . . . covered only the track and roadbed, and not the much more valuable rolling stock, stations, or yards.

Peter J. Galie & Christopher Bopst, *Anything Goes: A History of New York's Gift and Loan Clauses*, 75 Alb. L. Rev. 2005, 2011–12 (2012).

result any assumption of the liability of an employee is unconstitutional." We disagreed. We acknowledged the common law rule that an employer has a right of recourse against an employee if the employee is negligent, but emphasized that although "liability as between master and servant may be primary and secondary [a]s to them, the right of a damaged or injured third party to sue and hold the employer liable is, in effect, a direct or primary right." *Id.* at 867, 146 N.W.2d at 640. Similarly, here, both the TSB general contractor and IDOT are liable to subcontractors for unpaid work on public improvements. Article VII, section 1 is not violated merely because IDOT steps in to pay for work left unpaid by the TSB.

IDOT has the "heavy burden" to establish the statute is unconstitutional. *Seering*, 701 N.W.2d at 661 (internal quotation marks omitted). It has not cited a case from any jurisdiction applying a constitutional prohibition on extension of credit to private parties to strike down a statute equivalent to section 573.2, nor have we found such a case.[16] Indeed, we have never held any statute unconstitutional under article VII, section 1.

---

[16]We found one case holding a state constitutional prohibition like Iowa's was violated in a dispute between a subcontractor, general contractor, and the state. In that case, the State of Michigan retained contractual liquidated damages from payments due a general contractor in order to cover losses that resulted from a subcontractor's delays. *Solomon v. Dep't of State Highways & Transp.*, 345 N.W.2d 717, 718 (Mich. Ct. App. 1984). The general contractor sued to force payment. *Id.* In a conclusory opinion, the Michigan Court of Appeals held that requiring the state—rather than a general contractor—to bear the losses would violate Michigan's lending-of-credit provision. *Id.* at 718 (citing article 9, section 18 of the Michigan Constitution); *see also* Mich. Const. of 1963 art. 9, § 18 ("The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution."). This case did not involve the constitutionality of a statute. We do not find *Solomon* persuasive because it is factually distinguishable, devoid of analysis, and at odds with our precedent. *See Graham*, 259 Iowa at 867, 146 N.W.2d at 640; *Grout*, 195 Iowa at 472, 192 N.W. at 531.

The evils sought to be avoided by article VII, section 1 are not present here. IDOT has assumed liability for its own benefit—improvements to state-owned facilities. This is quite unlike the costly state government bailouts of investors in privately owned canals and railroads that prompted the adoption of the New York provision used by the Iowa framers as the model for article VII, section 1. *See Grout*, 195 Iowa at 472–73, 192 N.W. at 531; *see also Johns Hopkins Univ. v. Williams*, 86 A.2d 892, 900 (Md. 1952) ("The unquestionable historical reason for the proposal of the constitutional section . . . was to curb the reckless and improvident investment of public funds in aid of railroads and canals, promoted by private corporations, organized primarily for profit to their stockholders."). We conclude the framers of the Iowa Constitution did not intend to "foreclose[] something which . . . had no relation whatever to the problems they were facing." *Johns Hopkins Univ.*, 86 A.2d at 900.

For these reasons, we hold that section 573.2, as interpreted today, is constitutional. Article VII, section 1 does not prohibit the state from paying the subcontractors after the TSB's default. That statute puts IDOT in the position of a coprincipal, not a surety, with its TSB, Universal Concrete. We therefore decline to affirm the district court on the alternative ground raised by IDOT.

### IV. Attorney Fees.

The subcontractors have now prevailed on their claims against IDOT. Section 573.21 states, "The court may tax, as costs, a reasonable attorney fee in favor of any claimant for labor or materials who has, in whole or in part, established a claim." Fee awards under this section are discretionary. *Sheer Constr., Inc. v. W. Hodgman & Sons, Inc.*, 326 N.W.2d 328, 334 (Iowa 1982); *see also Grady v. S.E. Gustafson Constr.*

*Co.*, 251 Iowa 1242, 1252, 103 N.W.2d 737, 743 (1960) (affirming fee award under section 573.21 to party who prevailed in part).  Reasonable attorney fees include those incurred on appeal.  *See Schaffer v. Frank Moyer Constr., Inc.*, 628 N.W.2d 11, 23 (Iowa 2001) (holding mechanic's lien statute, Iowa Code section 572.32, allowed award of appellate fees to be calculated by district court on remand); *see also City of Riverdale v. Diercks*, 806 N.W.2d 643, 659–60 (Iowa 2011) (reviewing factors for determining reasonable attorneys fees and remanding case for district court to award reasonable appellate fees).  "An applicant for attorney fees has the burden to prove that the services were reasonably necessary and that the charges were reasonable in amount."  *Schaffer*, 628 N.W.2d at 23.

The district court did not reach the subcontractors' claims for attorney fees against IDOT because it erroneously ruled IDOT was not liable beyond the retainage.  The district court did award each subcontractor attorney fees in the uncontested summary judgments entered against Universal Concrete, which was already in default.  The fee awards, however, were made after the district court had granted IDOT's motion to dismiss.  Accordingly, IDOT had no opportunity to be heard on the reasonableness of the fees sought at that stage of the proceedings.  Meanwhile, the subcontractors have incurred additional fees litigating against IDOT through this appeal, with ultimate success.

We hold the subcontractors, as prevailing parties, are eligible, in the district court's discretion, to recover their reasonable attorney fees from IDOT, including fees incurred obtaining the default judgments against Universal Concrete and the additional fees incurred litigating against IDOT in district court and on appeal.  In determining whether to

award fees under section 573.21, the court may consider nonexclusive factors used in other discretionary fee-shifting statutes, such as

> "(a) [the] reasonableness of the parties' claims, contentions, or defenses; (b) [whether a party] unnecessarily prolong[s] litigation; (c) [the parties'] relative ability to bear the financial burden; (d) [the] result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons in the bringing or conduct of the litigation."

*In re Trust No. T-1 of Trimble*, 826 N.W.2d 474, 491 (Iowa 2013) (quoting *Atwood v. Atwood*, 25 P.3d 936, 947 (Okla. Civ. App. 2001)) (applying Iowa Code § 633A.4507 (2009)).

On remand, the district court shall determine whether to award the subcontractors attorney fees to be paid by IDOT and, if so, shall calculate the amount of fees to be awarded each subcontractor.

**V.  Disposition.**

We reverse the district court's ruling that granted IDOT's motion to dismiss the subcontractors' claims in excess of the retained funds.  We remand this case to allow the subcontractors' claims to proceed against IDOT for unpaid work on the projects, interest, costs, and reasonable attorney fees incurred in district court and on appeal.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

All justices concur except Appel and Wiggins, JJ., who concur specially.

**APPEL, Justice (concurring specially).**

The majority notes that this is a case of first impression and then chides the Iowa Department of Transportation (IDOT) for not citing a case striking down a statute equivalent to Iowa Code section 573.2. Of course, the subcontractors did not cite a case supporting the opposite proposition. The lack of cited authority is thus not dispositive or even indicative of the proper result. We often face a lack of authority, one way or another, when considering questions of first impression. In these cases, we may be called upon to think on our own.

The court's independent research has uncovered one case from another jurisdiction, however, that is close to the present case. In *Solomon v. Department of State Highways & Transportation*, 345 N.W.2d 717, 718–19 (Mich. Ct. App. 1984), the appellate court held that requiring the state to pay for losses incurred by a contractor on a state construction project would violate Michigan's lending of credit provision in its state constitution. The majority dismisses *Solomon* as factually distinguishable because it did not involve a statute and notes it is devoid of analysis. Yet, the Michigan court's approach seems loyal to the language of the Michigan constitutional provision, which I do not find distinguishable from article VII, section 1 of the Iowa Constitution. *See* Mich. Const. of 1963 art. 9, § 18 ("The credit of the state shall not be granted to, nor in aid of any person, association or corporation, public or private, except as authorized in this constitution.").

If there had been no Iowa caselaw on the question, I would perhaps be inclined to follow the approach in *Solomon*. Certainly, there is nothing in the history of article VII, section 1 that helps us. Nothing in the text suggests a contrary result. The somewhat open-ended

provisions of article VII, section 1, however, have been subject to a judicial gloss. Specifically, in *Grout v. Kendall*, 195 Iowa 467, 473–74, 192 N.W. 529, 531 (1923), we narrowly interpreted the credit provision of article VII, section 1 to apply only to prohibit the state from acting as a surety and incurring secondary liability. Thus, by judicial doctrine, we narrowed the scope of the credit provision of article VII, section 1.

Looking further into *Grout*, where judicial doctrine under article VII, section 1 begins, this court held the strong prohibitions in article VII, section 1 did not prohibit the state from incurring indebtedness by borrowing money to directly pay for obligations with a public purpose, namely, the payment of bonuses to veterans of World War I. *Id.* at 468, 473, 192 N.W. at 529, 531. This court contrasted the borrowing scheme at issue in *Grout* with historic disasters where state governments, with the often mistaken belief the primary obligor would pay, guaranteed the obligations of private corporations in massive undertakings, such as railroad and canal projects, undertaken for private benefit. *See id.* at 472–73, 192 N.W. at 531. When the private corporations failed to pay, the states became overwhelmed with indebtedness the states would never have agreed to incur as a primary obligor. *Id.* Accordingly, we held article VII, section 1 prohibited the state from incurring secondary liability, but was silent as to the creation of primary indebtedness, such as that at issue in the case. *Id.* at 473, 192 N.W. at 531. We cited *Grout*'s emphasis that article VII, section 1 covers surety relationships in a number of subsequent cases. *See, e.g., Richards v. City of Muscatine*, 237 N.W.2d 48, 62 (Iowa 1975); *Green v. City of Mt. Pleasant*, 256 Iowa 1184, 1197–98, 131 N.W.2d 5, 14–15 (1964).

In this case, unlike in *Grout*, IDOT is not *the primary obligor*. The primary obligor was the original contractor, Universal Concrete. Yet,

although IDOT will pay twice for most of the concrete services if the subcontractors prevail in this case, and although IDOT will pay what was once a primary obligation of the subcontractor, IDOT will arguably still receive a benefit: it will be more likely that minority subcontractors will feel secure in providing services related to state-owned highways.

I think it is a closer question than does the majority whether these kinds of relationships are outside the scope of article VII, section 1. The relationships are similar to surety relationships in the sense that the primary obligation is not one of IDOT. I am not at all convinced that the formal niceties of the law of suretyship with its fine slicing and dicing provides a sound basis for the interpretation of a constitutional provision in all cases. When dealing with open-textured constitutional provisions, I would look more to the underlying constitutional values and spirit rather than legal arcana.

On balance, however, and consistent with the evolving constitutional doctrine, I conclude that because IDOT in its proprietary capacity is the beneficiary of all of the work of all of the contractors, be they the general contractor or a subcontractor, IDOT may enter into financial arrangement to provide a class of subcontractors with security beyond the promise of the general contractor to pay without running afoul of article VII, section 1. I would hold nothing more, and nothing less. As a result, I concur in the result in this case.

Wiggins, J., joins this special concurrence.